903 A.2d 427 (2006)
387 N.J. Super. 81
STATE of New Jersey, Plaintiff-Respondent,
v.
Marcos Patino CABRERA, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 30, 2005.
Decided July 31, 2006.
*429 Miles Feinstein, Clifton, argued the cause for appellant.
Johanna Barba Jones, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Attorney General, attorney; Ms. Jones, of counsel and on the brief).
Before Judges STERN, PARKER and LIHOTZ.
The opinion of the court was delivered by
STERN, P.J.A.D.
Defendant was convicted of aggravated sexual assault of a four-month old and other offenses merged therein, and was sentenced to twelve years in the custody of the Commissioner of Corrections with four years to be served before parole eligibility. On this appeal defendant argues:
POINT I THE DEFENDANT'S ALLEGED CONFESSION SHOULD HAVE BEEN SUPPRESSED ALONG WITH THE STATE'S EVIDENCE AT THE SUPPRESSION HEARING AS IT WAS OBTAINED IN VIOLATION OF HIS FIFTH AMENDMENT RIGHTS AND NEW JERSEY PRIVILEGE AGAINST SELF-INCRIMINATION; THE STATE DID NOT PROVE BEYOND A REASONABLE DOUBT THAT THE "CONFESSION" WAS VOLUNTARY
POINT II JUDGE SOKALSKI ERRED IN DENYING THE MOTION FOR RECONSIDERATION OF THE DENIAL OF THE MOTION TO SUPPRESS THE CONFESSION
POINT III THE PROSECUTOR'S OPENING AND CLOSING STATEMENTS DEPRIVED THE DEFENDANT OF HIS SIXTH AMENDMENT AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL (PARTIALLY RAISED BELOW)
POINT IV THE TRIAL JUDGE ERRED IN DENYING THE MOTION FOR JUDGMENT OF ACQUITTAL IN FAVOR OF THE DEFENDANT AS TO COUNTS 1, 2 AND 3 AS THE STATE FAILED TO PROVE DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT CONTRARY TO THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND NEW JERSEY CONSTITUTION
POINT V THE PROSECUTOR IMPROPERLY COMMENTED UPON THE DEFENDANT'S RIGHT TO REMAIN SILENT IN VIOLATION OF HIS FIFTH AMENDMENT RIGHT TO REMAIN SILENT, SIXTH AMENDMENT AND FOURTEENTH *430 AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL AND STATE CONSTITUTIONAL RIGHT TO A FAIR TRIAL
POINT VI THE DEFENDANT'S SIXTH AMENDMENT CONFRONTATION RIGHT AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL WERE VIOLATED BY THE PROSECUTOR'S EXTENSIVE USE OF CHARTS MADE BY STATE'S WITNESSES DURING THE TRIAL
POINT VII THE TRIAL JUDGE ERRED IN ADMITTING INTO EVIDENCE THE REDACTED POLYGRAPH MIRANDA WAIVER FORMS IN VIOLATION OF DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHTS
POINT VIII THE TRIAL JUDGE ERRED IN DENYING THE MOTION FOR A NEW TRIAL IN VIOLATION OF DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL
POINT IX NUMEROUS LEGAL ERRORS OCCURRED WHICH EITHER INDIVIDUALLY, OR IN THEIR AGGREGATE, DEPRIVED THE DEFENDANT OF HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL
POINT X DEFENDANT'S RIGHTS UNDER THE VIENNA CONVENTION ON CONSULAR RELATIONS (VCCR), 21 U.S.T. 71 WERE VIOLATED
Our careful review of the record leads us to conclude that these contentions are without merit and that only the following discussion is required in a written opinion. See R. 2:11-3(e)(2).
We awaited resolution by the United States Supreme Court of a decision concerning the consequences of a violation of the Vienna Convention because of the impact that opinion could have on the admission of the statements and the prosecution in this case. On June 28, 2006, the Court held that a violation of the Convention does not warrant the suppression of a statement taken from a foreign national which would be otherwise admissible in our courts of law. See Sanchez-Llamas v. Oregon, ___ U.S. ___, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006). Foreign nationals accused of crimes receive the protections accorded by the law of this state including that required by the federal constitution. To the extent state courts may apply their own rules of law, the Convention, which provides only for notification to the foreign national of his right to consular notification of his detention, arrest, or imprisonment, presents no basis for either requiring the suppression of evidence for noncompliance, development of independent rules of law, or departure from the law as it now stands in New Jersey with respect to all accused offenders.[1]See, e.g., State v. King, 372 N.J.Super. 227, 241-42, 858 A.2d 4 (App. *431 Div.2004), certif. denied, 185 N.J. 266, 883 A.2d 1062 (2005); State v. Homdziuk, 369 N.J.Super. 279, 288-91, 848 A.2d 853 (App. Div.2004); State v. Jang, 359 N.J.Super. 85, 92-94, 819 A.2d 9 (App.Div.), certif. denied, 177 N.J. 492, 828 A.2d 919 (2003); State v. Cevallos-Bermeo, 333 N.J.Super. 181, 185-87, 754 A.2d 1224 (App.Div.), certif. denied, 165 N.J. 607, 762 A.2d 221 (2000). However, as the Supreme Court made clear "[a] defendant can raise an Article 36 claim as part of a broader challenge to the voluntariness of his statements to police." Sanchez-Llamas, supra, ___ U.S. ___, ___, 126 S.Ct. 2669, 2682, 165 L.Ed.2d 557, ___ (2006). In this case, the Passaic County Prosecutor's Office notified the Mexican Consulate of defendant's arrest on July 28, 2000 as the Convention requires.

I.
The essential evidence at trial[2] revealed the following: In July 2000, defendant was an eighteen and one-half year old citizen of Mexico in the United States and living in Passaic illegally. He could not read, write, or understand the English language; however, he could read, write, and understand the Spanish language. His highest level of education was the sixth grade, which he had completed in Mexico.
Approximately two buildings away from where defendant resided with his uncle, cousins and others including Rosalva Gonzalez, lived Bernarda M. and Felicito R. and their four-month old daughter, L.R. Several others were also residing in their home, including Bernarda's son Hippolito,[3] age seventeen. Rosalva sometimes babysat for L.R. while Bernarda and Felicito were at work.
On the evening of July 23, 2000, at approximately 10:00 p.m., Bernarda bathed L.R. She did not notice anything unusual with L.R. at that time; nor did she notice anything unusual with L.R. when she left for work at approximately 6:30 a.m. on July 24.
Felicito woke up shortly after Bernarda left for work on July 24. He changed L.R.'s diaper, and did not notice anything out of the ordinary at that time. At approximately 7:00 a.m., Felicito dropped L.R. off at Rosalva's home, where defendant also resided.
Rose Barrera, who resided in the apartment above defendant's, stated that between 11:00 a.m. and noon on July 24, 2000, she heard a baby crying loudly for approximately twenty minutes. The sound came from the downstairs apartment. Based upon her experience as the mother of five children, Barrera believed the cries came from a baby who was younger than one year old. However, Barrera was not aware that any babies under the age of one lived in the building at the time.
L.R. was picked up from the babysitter's home on the afternoon of July 24. When they arrived home, Bernarda checked the baby's diaper and discovered blood and an injury to L.R.'s vaginal area. After Felicito arrived home from work, Bernarda showed him L.R.'s injury and the two took her to St. Mary's Hospital for treatment.
The hospital notes reflect that L.R. arrived at approximately 6:00 p.m. According to Dr. Kirnan Mariwalla, the emergency room doctor at St. Mary's Hospital, L.R. *432 had suffered bruising and a laceration with bleeding, which extended the entire length of her perineum, from her vagina to her anus. The wound appeared "fresh," and the doctor estimated that it had been inflicted "within the past six to [ten] hours." The doctor decided to have L.R. transported to St. Joseph's Hospital, which had the pediatric surgical facilities necessary to perform a full examination and treatment of L.R.'s injuries.
The Division of Youth and Family Services ("DYFS") and the police were notified of L.R.'s injuries.
Investigator James Arnold, who was employed in the Child Abuse Unit of the Passaic County Prosecutor's Office, was assigned to the case at approximately 7:30 p.m. on July 24. Arnold coordinated with the Passaic Police Department and met Detective Milton Figueroa, a Spanish-speaking officer, at the Pediatric Intensive Care Unit of St. Joseph's Hospital in Paterson. Arnold took photographs of L.R.'s injuries, and the two officers interviewed Bernarda, with Detective Figueroa acting as interpreter.
Based upon information obtained from Bernarda, Investigators Arnold and Figueroa proceeded to the babysitter's home, arriving there after 10:30 p.m. They advised Rosalva about the subject of their investigation, and she agreed to be interviewed. She was then transported to the Passaic Police Station where she waived her Miranda rights and gave a statement.
Later the next morning, at 10:00 a.m. on July 25, 2000, Investigator Arnold returned to St. Joseph's Hospital with Investigator Hector Jiminez, a Spanish-speaking officer employed in the Child Abuse Unit of the Prosecutor's Office. Investigator Jiminez took additional photographs of L.R. while Investigator Arnold spoke with Bernarda (with the translation assistance of a Spanish-speaking nurse). The two Investigators then spoke with L.R.'s physician, Dr. Albert Sanz.
Dr. Sanz testified that L.R. had suffered a deep laceration, which extended the entire length of her perineum, from the external genital area to the anal area. She had also suffered "an obvious tear of the hymen," an internal structure/membrane located at the opening of the vagina. The injury was still oozing blood, so Dr. Sanz believed it had been caused only a short time before.
Dr. Sanz opined that L.R. had suffered a "severe, deep penetrating injury," with some object having been forced into the area. As to this issue, Dr. Sanz noted that the damage to L.R.'s hymen was indicative of penetration because the hymen is generally protected by the surrounding tissue. Surgery would be required to determine the extent of any internal damage.
An internal, surgical examination later revealed no injury to L.R.'s vaginal inside walls. However, given the injury to L.R.'s hymen, this finding did not alter Dr. Sanz's opinion that L.R. had suffered a penetrating injury. Sixty-five stitches were required to repair the damage.
Dr. Sanz continued to see L.R. for several follow-up examinations after his initial examination. He noted that, over the course of several months, between July and October 2000, the injury to L.R.'s hymen did not completely heal.
Based upon the information provided by Dr. Sanz, the Investigators suspected that a male individual had caused L.R.'s injuries. Accordingly, they began to interview males who had access to the child. They asked Bernarda to identify the male members of her household, and she executed a Miranda waiver form with respect to her juvenile son, Hippolito.
*433 The investigators went to L.R.'s home, where they spoke with Hippolito and Felicito, both of whom agreed to be interviewed. They were taken to the Passaic County Prosecutor's office where they were placed in separate interview rooms and advised of their Miranda rights. They waived their rights and gave formal statements to the police.
Thereafter, Bernarda gave a formal statement. Subsequently, the investigators began interviewing and taking statements from the male members of Rosalva's household. Defendant's uncle, Santiago Patino, Sr., was first to be formally interviewed.
Investigator Jiminez then spoke to Santiago Patino, Jr. and defendant, and both men agreed to be interviewed. They were taken to the Prosecutor's Office at approximately 12:00 a.m. on July 26. Neither man was restrained.
At the Prosecutor's Office, the men were placed in separate interview rooms and advised of their Miranda rights in Spanish. After both men had been Mirandized, Santiago Junior was interviewed first, followed by defendant. Thereafter, formal statements were taken from the two men separately, with Santiago Junior's statement taken first. Santiago's formal statement commenced at 3:00 a.m. and was completed at 3:37 a.m. The statement was reviewed with him and he was allowed to make corrections before he signed the statement.
Defendant was advised of his Miranda rights at 1:00 a.m. Defendant was provided with a Miranda form written in Spanish, which was read aloud with Investigator Jiminez. Defendant initialed the Miranda form after each of the enumerated rights, and he signed the bottom of the form, once to indicate that he understood his rights, and a second time to indicate that he voluntarily chose to waive his rights. Defendant was not handcuffed, and no weapons were present in the room.
Defendant was interviewed, and he gave a formal statement to the investigators between 4:00 a.m. and 4:30 a.m. Defendant denied any knowledge as to how L.R. had been injured. After the statement was taken, it was reviewed with defendant, he initialed the changes that were made, and he executed the statement under oath.
After defendant and Santiago Junior had given their statements, the investigators drove them home. There, the police asked Carlos Patino, Rosalva's husband, if he was willing to be interviewed. He agreed to be interviewed, and the investigators transported him to the Prosecutor's Office. At the Prosecutor's Office, the investigators advised Carlos of his Miranda rights, in Spanish, interviewed him, and took a formal statement from him. His statement was taken between 6:00 a.m. and 6:20 a.m. After the interview, the investigators drove Carlos home.
At 9:00 a.m. on July 26, 2000, Investigators Arnold and Jiminez met with other members of the Child Abuse Unit. Suspicion focused on four men: Felicito (the father), Santiago Senior, Santiago Junior, and defendant (members of the babysitter's household). Defendant in particular was suspected due to his nervousness when confronted at his home. Defendant avoided eye contact, looked around at the ground, and his hands were sweaty. The other individuals interviewed had not exhibited such nervous behavior.
The investigators decided to re-interview the suspected individuals. Later that day, the investigators asked the four men to come in for additional questioning. The men agreed to be re-interviewed, and they were transported to the Prosecutor's Office. Rosalva also agreed to be re-interviewed on the night of July 26.
*434 From the late afternoon of July 26, to the early morning hours of July 27, a team of investigators conducted interviews of the four male suspects and Rosalva. With respect to all interviews, Miranda warnings were again given prior to the questioning. During the hours the suspects spent at the Prosecutor's Office on July 26 and 27, they were provided with pizza, drinks and escorted access to the restrooms.
Defendant arrived at the Prosecutor's Office at approximately 4:00 p.m. on July 26. He remained at the office for at least ten hours, until the early morning hours of July 27, when he confessed to sexually assaulting L.R. The other members of the babysitter's household, Rosalva, Santiago Senior, and Santiago Junior, remained at the Prosecutor's Office during the same period of time.
During his time at the Prosecutor's Office, defendant was seated in a room which contained a long table, a bench with a handcuff, and several chairs. Defendant was not restrained, and he never asked to leave or stated that he wanted to leave. He never asked for an attorney, and never stated that he did not understand what was going on.
At 6:19 p.m. on July 26, before he was re-interviewed, defendant was again advised of his Miranda rights in Spanish. Defendant executed the form, which was written in English and translated into Spanish.
Thereafter, between 6:19 and 8:56 p.m., defendant was interviewed by Investigator Beatrice, with Investigator Resto acting as interpreter. During the early part of the interview, Beatrice obtained background information from defendant. Defendant stated that he had come to the United States from Mexico in April 1999, and he had lived temporarily with his brother in Los Angeles before coming to live with his uncle and cousins in Passaic, New Jersey.
Beatrice explained to defendant that he was being questioned in relation to the sexual assault of a four-month-old girl. During this part of the interview, defendant appeared sad; his head was lowered, his shoulders were hunched, and his voice was low. He stated that only a crazy person or a "monster" would do such a thing.
Investigator Beatrice asked defendant if his parents were aware of the allegations, and how they would feel if they were to find out. At this point, defendant's arms and legs were crossed, his head was down, and his voice was low. He responded that his parents would think "he was involved, that he did it." Beatrice asked defendant why his parents would believe that, and defendant did not respond.
Investigator Beatrice asked defendant to look at pictures of L.R. and her injuries. Investigators Beatrice and Resto then left the interview room and observed defendant from a monitoring room. They observed defendant push away a picture of L.R.'s face. At that point, the investigators reentered the room and Beatrice asked defendant why he had pushed away the facial shot. Defendant responded that the picture made him sad, and Beatrice instructed defendant to look at all the pictures and "realize what he was responsible for." The investigators then left the room for a second time and continued to observe defendant from the monitoring room. Defendant sat at the table with his head bowed over the pictures.
Investigator Beatrice decided to have Santiago Junior speak with defendant. Investigators Beatrice and Jiminez brought Santiago Junior into defendant's interview room and Jiminez translated the conversation between Santiago Junior and defendant, *435 which was conducted in Spanish.[4] As Santiago Junior was talking, defendant "just emotionally collapsed" and assumed a "defeated" posture. He sagged in his chair and lowered his head and shoulders.
Thereafter, defendant was left in the interview room alone while Investigator Beatrice observed Investigators Heath and Urena take a formal statement from Santiago Junior. Defendant was given pizza and a soda in the interim.
After Santiago Junior's statement was taken, Beatrice re-interviewed defendant, using Investigator Urena as a translator. Beatrice showed defendant the pictures of L.R. again, and he told defendant he "didn't believe that he didn't know anything about this" and stated his belief that defendant was "responsible for this." Beatrice asked again why defendant's parents would believe that defendant was responsible, and defendant did not respond.[5]
Showing defendant the pictures, Beatrice asked defendant how he could have caused the injuries, and how the injuries made him feel. Defendant appeared defeated and sad, and his eyes welled up with tears. Defendant responded that the pictures made him feel sad, and he crossed his legs and arms and lowered his head.
In Beatrice's opinion, defendant was using his physical movements to "block[] his emotions," so Beatrice "separated" and "uncross[ed]" defendant's legs and "took his arms down," and "held" defendant's hands. As Beatrice did so, defendant leaned his head into Beatrice's chin and began to cry. Investigator Beatrice told defendant he needed to be truthful and stated that he did not view defendant as a crazy person or a "monster." He asked defendant whether he was a "monster" or just a person who had used poor judgment, and defendant responded that he had used poor judgment. Defendant stated that he was sorry, and he thanked Beatrice "for not thinking [of] him as a monster."
Defendant then explained his version of events. He was very sad and very soft-spoken; his eyes filled up with tears, and he spoke with his head down, at the level of Beatrice's chest. At first, defendant maintained that, as he was coming from the shower on July 24, he saw L.R. lying on the bed in Carlos and Rosalva's room. She had no clothes on, and he believed she was going to fall off the bed, so he had grabbed her by the leg. Beatrice explained that L.R.'s injuries could not have been caused by defendant grabbing her leg.
Defendant then revised his version of events. He stated that he went into Carlos and Rosalva's room after he took a shower. He saw L.R. on the bed, crying, without any clothes on. He picked her up to comfort her, and, as he did so, she slipped out of his hands. As he attempted to grab her, his right index and middle finger entered her vagina. As he made this statement, defendant was crying and repeatedly saying that he had not done it on purpose. Beatrice "held his hands and *436 told [defendant] it was all right," and "comforted him."[6]
Beatrice asked defendant why he had not told his family or Investigators Arnold and Jiminez what had happened, and defendant responded that he had been "embarrassed" and "scared," and he "didn't want to be perceived as a monster." He had been so upset by the incident that he had been unable to eat supper on the evening it happened.
Beatrice advised defendant that, based upon his admissions, he would be arrested and charged. He asked defendant if he would provide a formal statement, and defendant responded that he would.
Thereafter, between 1:10 a.m. and 2:15 a.m. on July 27, a formal statement was taken from defendant. Defendant was questioned by Investigator Beatrice, with Investigator Urena translating and Investigator Arnold typing.
As the statement was taken, defendant sat in one of the chairs at the table. Investigator Beatrice was seated next to defendant, while Investigators Arnold and Urena were at the end of the table. Defendant was not restrained, and no weapons were present in the room. Defendant was not physically threatened or injured in order to coerce a confession.
As he was giving the statement, defendant explained his version of events, as he had previously done with Investigator Beatrice, stating that he had accidentally penetrated L.R. with his fingers while attempting to grab her and prevent her from falling. At or about this point in the statement, Investigator Arnold interrupted and told defendant that he would type defendant's version of events, but he "didn't believe" his story. Arnold told defendant that he did not believe a judge or jury would believe him.
Investigator Beatrice was upset that Investigator Arnold had interrupted the interview because he believed defendant might shut down and refuse to continue. Reacting to Investigator Arnold's statements, defendant began to lower his head, cross his legs, and cry. As defendant did so, Investigator Beatrice "rub[bed] his shoulders" and told him "it was okay."
Defendant then stated that he had "used his penis." Investigator Beatrice asked defendant to explain, and defendant responded that, after his shower on July 24, he had passed Carlos and Rosalva's room. L.R. was on the bed with a towel, and defendant was dressed. He lowered his pants and sat on the bed. His penis was erect. He put the baby on top of his penis and "pumped her two or three times," explaining that his penis went "halfway" into the vagina.[7] Defendant stated that L.R. "cried [and he] got scared," so he "put her down" and "left the room."
As he confessed, defendant spoke in a soft voice, but he was not crying. Defendant stated that he "felt terrible [and] sad" for what he had done, and that he "wasn't *437 a monster." He understood that he would be arrested and go to jail, but he had given the statement because he felt bad for the baby.
After the statement had been taken, Investigator Urena reviewed the statement in Spanish with defendant. He allowed defendant to make corrections, and both he and defendant initialed each page of the statement. Defendant admitted that he had been treated well by the police and was not coerced in any way.
At the conclusion of the statement, defendant asked to use the bathroom, and Investigator Beatrice escorted him to the men's room. Just before he entered the bathroom, defendant turned, hugged Investigator Beatrice, and said "thank you" in English.
Defendant was then arrested and a photo was taken of him. In his pretrial ruling, the motion judge noted that the photo shows no sign of physical injury of defendant.
Antonio Burr, Ph.D., a psychologist, testified on behalf of defendant at the trial. Dr. Burr opined that defendant had an I.Q. of approximately sixty-five, which placed him in the range of mild mental retardation. However, Dr. Burr admitted that the test upon which he based that conclusion was non-verbal and therefore insufficient to diagnose a person with mental retardation.
Dr. Burr also opined that, based upon defendant's responses on a Rorschach Psycho Diagnostic Test, defendant had a very limited capacity to address complex, ambiguous, or emotionally charged matters. Finally, Dr. Burr did not find any evidence that defendant suffered from sexually deviant arousal patterns.

II.
Defendant asserts that his statements were inadmissible because he was an eighteen-year old illegal alien with an I.Q. of 65 and was mildly retarded, could not read or speak English, and was in the interrogation room for eight hours, commencing around 6 p.m. on July 26, 2000, and in custody about twelve hours before the formal statement was taken. He also points to the fact that the incriminatory formal statement on July 27 was given only after Detective Arnold, who was typing it on his laptop, interrupted Detective Beatrice and told defendant that no one would believe what he was saying and refused to take it down. Moreover, defendant insists his statement cannot be deemed credible, therefore affecting its admissibility, because Dr. Sanz indicated that the injuries would have been "catastrophic" if they occurred as detailed in the final statement given.
Judge Ronald Sokalski, the judge who heard the motion to suppress, rendered a comprehensive written opinion admitting into evidence both the written statement taken from defendant between 4:00 and 4:30 a.m. on the morning of July 26, 2000 and the formal written statement taken between 1:10 and 2:15 a.m. in the early morning of July 27, 2000. As to both, the judge found defendant was advised of, and knowingly, intelligently and voluntarily waived, his Miranda rights, and that the statement was "voluntary."[8]
*438 We affirm the admission of the statements of Judge Sokalski substantially for the reasons expressed in his letter opinion of October 19, 2001, and add the following.
"Confessions obtained by police during custodial interrogation are barred from evidence unless the defendant has been advised of his constitutional rights. Miranda v. Arizona, 384 U.S. 436, 444-45, 467-79, 86 S.Ct. 1602, 1612, 1624-30, 16 L.Ed.2d 694, 706-07, 719-26 (1966)." State v. Timmendequas, 161 N.J. 515, 613, 737 A.2d 55 (1999), cert. denied, 534 U.S. 858, 122 S.Ct. 136, 151 L.Ed.2d 89 (2001); see also State v. Knight, 183 N.J. 449, 461-63, 874 A.2d 546 (2005); State v. P.Z., 152 N.J. 86, 102, 703 A.2d 901 (1997). For statements made to the police in custodial interrogations to be admissible, the State must prove beyond a reasonable doubt that the defendant waived his right against self-incrimination, or Miranda rights, and that his decision to do so was knowing, intelligent, and voluntary in light of all the circumstances. State v. Knight, supra, 183 N.J. at 461-63, 874 A.2d 546; State v. A.G.D., 178 N.J. 56, 67, 835 A.2d 291 (2003); State v. Presha, 163 N.J. 304, 313, 748 A.2d 1108 (2000); State v. Timmendequas, supra, 161 N.J. at 613-14, 737 A.2d 55; State v. Reed, 133 N.J. 237, 250-51, 627 A.2d 630 (1993).
The State must also prove, beyond a reasonable doubt, that defendant's statement to the police was voluntarily made and not the product of coercion or "official misconduct." Jackson v. Denno, 378 U.S. 368, 376-77, 84 S.Ct. 1774, 1780-81, 12 L.Ed.2d 908, 915-16 (1964); State v. Knight, supra, 183 N.J. at 463, 874 A.2d 546; State v. Cook, 179 N.J. 533, 562-63, 847 A.2d 530 (2004); State v. Timmendequas, supra, 161 N.J. at 613-14, 737 A.2d 55; State v. Bey, 112 N.J. 123, 134, 548 A.2d 887 (1988), cert. denied, 513 U.S. 1164, 115 S.Ct. 1131, 130 L.Ed.2d 1093 (1995). In determining the voluntariness of a defendant's statement, courts consider whether the statement was "`the product of an essentially free and unconstrained choice by its maker,' in which case the statement may be used against the defendant, or whether the defendant's `will has been overborne and his capacity for self-determination critically impaired.'" State v. P.Z., supra, 152 N.J. at 113, 703 A.2d 901 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225-26, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1973)). "This issue can be resolved only after an assessment of the `totality of the circumstances' surrounding the statement." Ibid. (quoting Arizona v. Fulminante, 499 U.S. 279, 285-86, 111 S.Ct. 1246, 1251-52, 113 L.Ed.2d 302, 315 (1991)); State v. Timmendequas, supra, 161 N.J. at 614, 737 A.2d 55; State v. Galloway, 133 N.J. 631, 654, 628 A.2d 735 (1993). "Among the factors to consider in determining voluntariness are the suspect's age, education, intelligence, previous encounters with law enforcement, advice received about his or her constitutional rights, the length of detention, the period of time between administration of the warnings and the volunteered statement, and whether the questioning was repeated and prolonged in nature or involved physical or mental abuse." State v. Timmendequas, supra, 161 N.J. at 614, 737 A.2d 55. Accord, State v. Miller, 76 N.J. 392, 402, 388 A.2d 218 (1978).
Defendant was not continuously questioned while in custody, as the interpreters were simultaneously interviewing others as well. Moreover, the interrogation occurred *439 during hours when defendant was usually at work, so he was not unduly tired. And defendant was given food and drink during this period. Nor can it be said that he was "targeted" or "singled out" in any way. His relatives and members of his household were similarly treated. Further, despite repeated warnings, defendant never asked for an attorney or for the interrogation to stop.
As already noted, after the N.J.R.E. 104 hearing, Judge Sokalski concluded that defendant had been advised of his Miranda rights, understood those rights, and knowingly and voluntarily waived them and gave voluntary statements.
Judge Sokalski also denied defendant's motion for reconsideration made about nine months after his decision following the N.J.R.E. 104 hearing based upon the expert report of Dr. Burr. He found that nothing in Dr. Burr's report was inconsistent with his previous holding that defendant understood his Miranda rights, and that he knowingly, voluntarily, and intelligently waived those rights.
Similarly, before sentencing defendant, Judge Miguel de la Carrera, before whom the case was tried, denied defendant's motion for a new trial.[9] To the extent it was based upon the admission of defendant's statements to the police, Judge de la Carrera stated:
[N]one of what I heard or saw during the trial led me to a different conclusion than Judge Sokalski did with regard to the voluntariness of that confession. In fact, I'll note that I allowed the defense some leeway during cross-examination at times where it was implied that the defense would later be bringing in some evidence of much greater coercion.
....
But nothing that I saw and heard during the trial suggested to me that it wasn't a voluntary statement. And it was one which was elicited gradually through questioning.... There had ... been no pressure at the time of the first statement and ... there were some seven or so different suspects initially. Including the father and brother of the victim.
It was after ... [defendant] was the only one not to pass ... the polygraph exam that further questioning was undertaken. At which point ... the story essentially came out in dribs and drabs. And what's been described as the breakdown I think was properly characterized by [the prosecutor] because it was the way that it struck me.
And that even the slumping of ... [defendant] was a physical manifestation of what had happened. He had unburdened himself of his guilt. He had begun with outright denial. He had gone through a modified confession in terms of the accidental digital penetration, and ultimately came to the  the intentional, but nonetheless, brief penile penetration. Limited as that penetration was, but significant nonetheless, as it was.
And indeed, there were descriptions by  I think it was Investigator Beatrice... that the defendant afterwards requested to go to the lavatory, and, in fact, in some fashion hugged or embraced that investigator and thanked him. He said thank you.
All of which, to my mind, was consistent with the actions of someone who was relieved in the way that I think common experience tells all of us people often are when they have confessed *440 something which has been laying on their mind.
....
[W]hile it was . . . some time into the middle of the night . . . this did not appear to be a water torture involved here. Something extraordinarily out of  things of the length of the interview or the  the hour of the night, in fact, I believe, when information came to the investigator's attention.
[W]ould it be a better practice to audiotape and/or videotape statements taken in witness interview rooms? Unquestionably. To what extent is that observed anywhere? I don't know. What would the cost be of doing that as a routine procedure? To what extent is cost the ... principal reason for not doing it? I don't know.
[Videotaping is] quite frequently helpful in an inculpatory rather than an exculpatory way. So the notion that the video cameras aren't there because it's... part of a ... web designed to catch somebody in a coerced confession . . . is not persuasive to me. And I found nothing to suggest that . . . there was coercion of any kind.
The actions of the Prosecutor's investigators and the ... Passaic officers involved seemed to me quite . . . appropriate and quite professional in that regard.
The retardation question which was related to that, there was lots of detailed information with regard to that and it was noted that it was a borderline retardation....
[T]here's every indication by Dr. Burr that the defendant was coherent. That he answered responsively to his questions. That he was oriented to time and place and everything else.
And he had been employed, gainfully employed for some period of time. There was  indeed, the testimony was that the grade level that he had completed. . . in school in Mexico was the equivalent of something at least of completion of Middle School and I believe even the early stages of high school....
....
I'm satisfied that he was properly instructed as to his Miranda rights.
We find, under our scope of review, no basis for disturbing the motion judge's determination (supported by the trial judge) that the statements were voluntary and admissible. State v. Locurto, 157 N.J. 463, 470-75, 724 A.2d 234 (1999); State v. Bey, supra, 112 N.J. at 142, 548 A.2d 887; State v. Craig, 237 N.J.Super. 407, 413, 568 A.2d 100 (App.Div.1989), certif. denied, 121 N.J. 662, 583 A.2d 348 (1990); State v. Godfrey, 131 N.J.Super. 168, 174, 329 A.2d 75 (App. Div.1974), aff'd, 67 N.J. 267, 337 A.2d 371 (1975). Here, the issue of credibility was for the jury, and it was so instructed. N.J.R.E. 104(c); State v. Hampton, 61 N.J. 250, 271-72, 294 A.2d 23 (1972).[10] Moreover, the Supreme Court Committee's recommendation following State v. Cook, supra, 179 N.J. at 562, 847 A.2d 530, requiring the recordation of all custodial interrogation is not effective with respect to non-murder cases until next January. See Supreme Court Administrative Determination Re: Report of Special Committee on Recordation of Custodial Interrogations, 182 N.J.L.J. 346, 347 (October 24, 2005). And to the extent defendant complains he was tricked by the police or advised to change his statement because he was not believed, we note that "[u]nlike *441 the use of physical coercion, ... use of a psychologically-oriented technique during questioning is not inherently coercive.... Cases holding that police conduct had overborne the will of the defendant have typically required a showing of very substantial psychological pressure on the defendant." State v. Galloway, supra, 133 N.J. at 654-55, 628 A.2d 735. As stated in State v. Knight, supra:
In short, we find there was sufficient credible evidence for the trial court to find that the State proved beyond a reasonable doubt that defendant voluntarily waived his right against self-incrimination and freely gave his ... statement to the police.
[183 N.J. at 469, 874 A.2d 546.]
Accordingly, we affirm the admissibility of defendant's statements.
The proof was sufficient to sustain the conviction for aggravated sexual assault; see State v. Reyes, 50 N.J. 454, 458-59, 236 A.2d 385 (1967); the object inserted and depth of penetration was not relevant to constitute a first degree crime of a victim of four months, see N.J.S.A. 2C:14-2(a)(1), as alleged in count one. See N.J.S.A. 2C:14-1c. As stated by the trial judge in denying a judgment of acquittal:
[I]n looking at the evidence that's been presented to date, and giving ... the benefit of all inferences which could be drawn to the State in support of a conviction, and incorporating counsel's request to analyze this matter from a commonsense point of view, I have to deny the defense's motion.
Common sense tells me that when the defendant ... used the expression that he penetrated this child, that he went halfway in, ... that there's anything other than penetration. There was obviously no measuring which occurred by [defendant] of the length of his erection or the exact amount that there was penetration. I could even see had the exact word or equivalent thereof, halfway, been used in Spanish, that it was still a figure of speech, meaning the equivalent of partway.
The fact that it would be a medical impossibility to penetrate halfway of an adult male's erect penis doesn't mean that that's the theory of the State's case, and that that's what all of the medical evidence shows.
There is medical evidence here of a substantial injury requiring 65 stitches. And the fact that ... it clearly would not be possible for there to be a penetration halfway in doesn't mean that that's what this case [is] about, that the jury needs to conclude that there was.... [T]here's no evidence at this point [about] the length of the defendant's male member when he is erect. But let's say we're six inches, that it went in three inches, there's nothing resembling any precision regarding the degree of penetration.
Simply the issue here and the charge here involve penetration. The charge isn't that he penetrated halfway in. The charge is penetrating. And that's what the indictment says, the three counts of the indictment say. And I find that the State has met its burden at this point. And these are issues for the jury to decide.
Finally, the State could ask Dr. Burr about the nature and scope of his interview with defendant, including defendant's reticence in answering, for purposes of evaluating the credibility of the expert opinion. State v. Burris, 298 N.J.Super. 505, 511-16, 689 A.2d 860 (App.Div.), certif. denied, 152 N.J. 187, 704 A.2d 17 (1997).
We find no other contention warranting comment. Any error was cured by the judge's instructions or, particularly given *442 the admission of defendant's statements, harmless. No issue is raised concerning the sentence.
The judgment of conviction is affirmed.
NOTES
[1] According to Chief Justice Roberts for the Sanchez-Llamas majority, "Article 36 has nothing whatsoever to do with searches and interrogations. Indeed, Article 36 does not guarantee defendants any assistance at all. The provision secures only a right of foreign nationals to have their consulate informed of their arrest or detention...." ___ U.S. at ___, 126 S.Ct. at 2672, 165 L.Ed.2d at ___.
[2] The following is taken from the trial testimony so as to detail all facts of relevance to the issues we discuss. The testimony at the N.J.R.E. 104 hearing concerning defendant's statements presented by the State was not inconsistent. It will be discussed to the extent necessary for consideration of the admissibility of the statements.
[3] The name is spelled differently at different places in the record.
[4] The conversation was excluded from admission at trial because Santiago Junior was unavailable as a witness. During the pretrial hearing, however, Investigator Jiminez testified that Santiago Junior told defendant to be truthful, and advised defendant that the family believed he had committed the crime.
[5] Beatrice was a polygrapher. The fact that polygraph examinations were given was not admitted into evidence, but the Miranda waiver forms (in English and Spanish) he used were admitted as relevant. At the motion to suppress, Investigator Beatrice described the polygraph procedure and form used and read in Spanish by Investigator Resto. Beatrice's direct testimony at the motion hearing appears as "Jiminez-Recross." All information pertaining to the polygraph was redacted from the forms admitted at trial.
[6] On cross-examination by defense counsel, Beatrice admitted that he did not believe the second version of events was any more truthful than the first. He believed defendant was presenting the incident as accidental because he did not want to be perceived as a "monster."
[7] Dr. Sanz opined that, if an adult claimed he had inserted his penis halfway into the vagina of a four-month-old baby, and pumped two or three times, Dr. Sanz "would expect that this person did not understand the meaning of inside the vagina." Dr. Sanz stated that he did not "know how a person could tell that their penis was anywhere inside the vagina in a child this age." Dr. Sanz noted that, in a child this size, the vagina is only approximately one-inch deep. Therefore, it would have been impossible for anyone to insert an erect, adult male penis inside L.R.'s vagina without causing catastrophic injuries.
[8] Defendant does not assert that the failure to honor the Vienna Convention affected the voluntariness of his confession. In light of the warnings given and the fact notification was given, we see no basis for such a contention. Moreover, everything was translated into Spanish for defendant and embodied in Spanish waiver forms, and defendant "would have little need to invoke the Vienna Convention, for Miranda warnings a defendant is unable to comprehend give the police no green light for interrogation." Sanchez-Llamas v. Oregon, supra, ___ U.S. at ___, 126 S.Ct. at 2686, 165 L.Ed.2d at ___ (Ginsburg, J. concurring).
[9] We do not address whether the admissibility can be re-addressed based on trial evidence beyond what is required by N.J.R.E. 104(c).
[10] The judge gave a thorough charge on the issue of evaluating the credibility of the statements and a Kociolek charge with respect to the oral statements. See State v. Kociolek, 23 N.J. 400, 421, 129 A.2d 417 (1957).