974 A.2d 1092 (2009)
408 N.J. Super. 273
STATE of New Jersey, Plaintiff-Respondent,
v.
German MARQUEZ, Defendant-Appellant.
DOCKET NO. A-5044-07T4
Superior Court of New Jersey, Appellate Division.
Argued May 11, 2009.
Decided July 1, 2009.
*1093 Michael B. Blacker argued the cause for appellant.
Anne Marie Gibbons-Lejnieks, Union County Assistant Prosecutor, argued the cause for respondent (Theodore J. Romankow, Union County Prosecutor, attorney; Ms. Gibbons-Lejnieks, of counsel and on the brief.).
Before Judges CARCHMAN, R.B. COLEMAN and SABATINO.
The opinion of the court was delivered by
SABATINO, J.A.D.
Defendant German Marquez, a licensed New Jersey driver, appeals his conviction of refusing to submit to a breath test, N.J.S.A. 39:4-50.2, after being arrested for drunk driving. Defendant argues that because he is only fluent in Spanish and does not understand English, he cannot be guilty of refusing to comply with the standard breath test instruction (the "standard statement"), which the arresting police officer read to him in English.
We affirm defendant's conviction because the law does not require a translation of the standard statement under N.J.S.A. 39:4-50.2(e) and because defendant gave his implied consent to submit to a breath test when he obtained his New Jersey driver's license. However, we recommend that, as an administrative matter, the Motor Vehicle Commission prospectively consider having the standard statement translated into Spanish and perhaps other prevalent foreign languages.
The facts relevant to our consideration of the issues on appeal are substantially undisputed. On the evening of September 20, 2007, defendant's Toyota struck the rear end of another vehicle at or near the intersection of Park Avenue and West Second Street in Plainfield. A Plainfield patrolman, Officer Shane Lugo, arrived at the accident scene. The officer observed both vehicles facing in a southbound direction. Defendant was seated behind the wheel of the Toyota, with its engine still running.
*1094 Speaking in English, Officer Lugo requested defendant's driving credentials. After it became apparent that defendant did not understand him, Officer Lugo repeated his request in Spanish.[1] Defendant then produced a valid New Jersey driver's license, a vehicle registration and an insurance card. As this was occurring, Officer Lugo smelled alcohol and noticed that defendant was slurring his words. The officer also noticed that defendant had to brace himself to get out of his car and then began leaning against a tree. Consequently, Officer Lugo asked defendant, in English, to perform certain field sobriety tests. Defendant did not comply, apparently not understanding the request.
Based on his observations, Officer Lugo placed defendant under arrest and transported him to police headquarters. He noticed that defendant's eyes were bloodshot and droopy, and that his speech was "whiny." The officer believed defendant was intoxicated.
Upon arriving at headquarters, Officer Lugo ushered defendant into a room where the Alcotest 7110[2] breath test is administered. The officer activated a video camera that taped[3] the events. Officer Lugo then read to defendant, in English, all eleven paragraphs of the standard statement mandated by N.J.S.A. 39:4-50.2(e). Among other things, the statement explains the mandatory nature of the breath test, the minimum penalties for refusing the test, and the test subject's right to have a defense expert conduct independent chemical testing of the sample.
After the standard statement was read to him in English, defendant responded in Spanish, "No entiendo," meaning "I do not understand." Officer Lugo then visually demonstrated to defendant, an estimated "three or four times," how to blow air into the test device. Defendant did not perform the test. Instead, he shook his head and pointed to one of his eyes. Officer Lugo memorialized this reaction on a police form, noting that defendant "[s]hook head."
Another Plainfield police officer, Anthony Berlinski, was also in the room and was prepared to administer the Alcotest to defendant. According to Officer Berlinski, he watched Officer Lugo read the statement to defendant. He then saw defendant's negative reaction, which he construed as a refusal. Berlinski duly recorded the refusal. On cross examination, Berlinski, a nineteen-year veteran police officer, acknowledged that he had been trained to read the standard statement aloud only in English.
Defendant was issued summonses for driving while intoxicated ("DWI"), N.J.S.A. 39:4-50; refusal to submit to a breath test, N.J.S.A. 39:4-50.2; and careless driving, N.J.S.A. 39:4-97.
At his ensuing trial in municipal court, defendant testified through a Spanish interpreter. The prosecution did not contest defendant's need for an interpreter. Nor did the State dispute defendant's unwavering claim that he did not understand Officer Lugo when the officer read aloud the standard statement in English.
In his translated testimony, defendant maintained that he had not consumed any alcohol before driving on the night of his arrest. He claimed that he had not had a drink since sustaining an eye injury about *1095 five months earlier. He stated that he had felt somewhat sleepy and dizzy as the result of taking Percocet about twenty minutes before driving.
Defendant acknowledged that Officer Lugo had read aloud a statement to him at police headquarters. He advised the court that he did not understand the statement because it was in English. Defendant also noted that he had taken the written examination for the New Jersey driver's license in Spanish.
The State relied at trial upon the testimony of Officers Lugo and Berlinski, as well as the videotape and the official police records noting defendant's refusal to perform the breath test. In summation, the prosecutor argued that the rear-end accident caused by defendant amply established his culpability for careless driving. Additionally, the accident, coupled with Officer Lugo's perceptions of defendant's bloodshot eyes, odor, slurred speech and swaying, proved his guilt of the DWI offense.
As to the refusal violation, the prosecutor argued that Officer Lugo discharged his responsibility by reading the standard statement in English. The prosecutor maintained that the statement did not have to be translated for defendant into Spanish, relying upon State v. Nunez, 139 N.J.Super. 28, 32-33, 351 A.2d 813 (Law Div.1976) (holding that no such translation is required as a predicate to a refusal violation). The defense, meanwhile, contended that, given the undisputed language barrier here, a translation of the standard statement was necessary in order to convict defendant beyond a reasonable doubt of a refusal.
The municipal judge found defendant guilty of all three cited violations. The judge concluded that the DWI violation was sufficiently established by the "strong odor of alcohol" from defendant, his "stumbling out of the car," and his "bracing himself against the car as he walked." The judge also was satisfied that the proofs sufficed to support a careless driving violation.
With respect to the refusal charge, the municipal judge noted that he had observed the videotape twice, which clearly showed that Officer Lugo had read the prescribed standard statement to defendant in English. The judge found defendant's lack of understanding of English "immaterial," given the requirements of the implied consent law as a condition of licensure. In this regard, the judge relied upon Nunez, supra, a case that has been cited at least twice in published opinions and has "never been overturned by an appellate court." The judge also noted the practical difficulties implicated by defendant's claim that the police have a legal duty to translate the standard statement, noting the "hundreds of languages" spoken in this country. Because defendant indisputably failed to perform the breath test after being given the opportunity to do so, the court found him guilty of a refusal violation.
In sentencing defendant, the municipal judge recognized that he has a "relatively clean driving record." Accordingly, the judge imposed the minimum seven-month license suspension for the refusal violation, as well as a concurrent three-month suspension for the first-time DWI infraction. The careless driving violation was merged with those charges. Appropriate fines and other monetary sanctions were also imposed. The fines and suspensions were stayed, pending de novo review by the Law Division.
On de novo review, the Law Division sustained defendant's convictions. The Law Division judge rejected defendant's argument that the police were obligated to translate the standard statement into Spanish, either under the applicable statutes *1096 or under constitutional principles of due process.
Defendant now appeals. His appeal is confined to the refusal conviction, reiterating his argument that he cannot be guilty of that offense because he does not understand English. We now examine that argument.
Pursuant to N.J.S.A. 39:4-50.2(a), "[a]ny person who operates a motor vehicle on any public road ... in this State shall be deemed to have given his consent to the taking of samples of his breath for purposes of making chemical tests to determine the content of alcohol in his blood[.]" However, a police officer seeking such a breath sample must have "reasonable grounds to believe" that the driver has been operating his motor vehicle while intoxicated. Ibid. Defendant does not contest that Officer Lugo, in requesting his breath sample, possessed such reasonable grounds to believe that he had committed a DWI offense.
A motorist has no right to withhold cooperation when a police officer seeks a breath sample, because the motorist's "very driving upon the highway" imputes consent to undergo the test. State v. Kenderski, 99 N.J.Super. 224, 230, 239 A.2d 249 (App.Div.1968). A response that falls "substantially short of an unconditional, unequivocal assent to an officer's request" to take a breath test "constitutes a refusal to do so." State v. Widmaier, 157 N.J. 475, 497, 724 A.2d 241 (1999) (internal citations omitted).
There are strong and long-established public policies that underlie this strict regulatory approach. See State v. Tischio, 107 N.J. 504, 512, 527 A.2d 388 (1987) (noting the State's policy to "curb the senseless havoc and destruction" caused by drunk driving). As the Supreme Court recognized in Widmaier, supra, 157 N.J. at 497, 724 A.2d 241, any other approach "would undermine law enforcement's ability to remove intoxicated drivers from the roadways." See also State v. Wright, 107 N.J. 488, 497-502, 527 A.2d 379 (1987) (broadly construing the refusal statute, in light of its legislative purposes "in facilitating drunk driving investigations"). "The refusal statute was enacted by the Legislature to combat the `high rate of refusal[s] [which] made enforcement of the drunk driving laws difficult.'" State v. Breslin, 392 N.J.Super. 584, 591, 921 A.2d 1163 (App.Div.2007) (quoting State v. Tekel, 281 N.J.Super. 502, 505, 658 A.2d 1281 (App. Div.1995)).
Refusal to submit to a breath test triggers a mandatory suspension of the motorist's driving privileges. N.J.S.A. 39:4-50.4a(a). For a first-time offender, the mandatory suspension is "not less than seven months or more than one year." Ibid. The Legislature has specified that, in a case charging the motorist with refusal, the municipal judge is to determine whether: (1) "the arresting officer had probable cause to believe that the person had been driving or was in actual physical control of a motor vehicle ... while ... under the influence of intoxicating liquor" or a narcotic or other controlled dangerous substance; (2) "the person was placed under arrest, if appropriate"; and (3) the driver "refused to submit to the test upon request of the officer." Ibid. As the result of the Supreme Court's decision in State v. Cummings, 184 N.J. 84, 88, 875 A.2d 906 (2005), the State must prove these elements beyond a reasonable doubt, given the quasi-criminal nature of the refusal offense.
The elements of a refusal offense do not include proof that the driver actually comprehended the police officer's instruction. To the contrary, the Supreme Court in Widmaier "emphasize[d] that a defendant's subjective intent is irrelevant in determining whether the defendant's *1097 responses to the officer constitute a refusal to take the test." 157 N.J. at 498, 724 A.2d 241. If the law were otherwise, some motorists might illicitly feign such lack of comprehension to evade liability for a refusal.
We are mindful that the Legislature authorized the standard statement, N.J.S.A. 39:4-50.2(e), as a procedural device "to help ensure that defendants understand the mandatory nature of the [breath] test, their limited rights to counsel for purposes of the test, and the need for unequivocal, affirmative consent." Widmaier, supra, 157 N.J. at 489, 724 A.2d 241. The statute states that the standard statement, in the form "prepared by the director [of the Division of Motor Vehicles[4]]," "shall be read by the police officer to the person under arrest." N.J.S.A. 39:4-50.2(e). The statute does not specify the language of the statement to be read to the arrestee.
Where a breath test has been administered, the arresting police officer "shall inform the person tested of his rights under subsections (b) and (c) of [the refusal statute]." N.J.S.A. 39:4-50.2(d) (emphasis added). Subsection (b) refers to the defendant's right to a copy of the test results, N.J.S.A. 39:4-50.2(b), and subsection (c) refers to the defendant's right to have an independent test performed, N.J.S.A. 39:4-50.2(c). Apart from these two discrete items, "the [refusal] statute sets forth no other affirmative duties on the part of the police." State v. Greeley, 178 N.J. 38, 43, 834 A.2d 1016 (2003). However, law enforcement may not "thwart the right to an independent test through arbitrary actions or policies that would render the statutory right meaningless." Ibid.; see also State v. Jalkiewicz, 303 N.J.Super. 430, 697 A.2d 155 (App.Div.1997); State v. Ettore, 228 N.J.Super. 25, 30, 548 A.2d 1134 (App.Div.1988). Applying this standard, the Court held in Greeley that a police department's policy to not release a DWI detainee until he can arrange a sober escort from the stationhouse did not interfere with the defendant's "statutory right" to pursue independent testing. 178 N.J. at 49, 834 A.2d 1016.
Following Greeley, in State v. Howard, 383 N.J.Super. 538, 548, 892 A.2d 751 (App.Div.), certif. denied, 187 N.J. 80, 899 A.2d 303 (2006), we held that the prosecution in a refusal case is not required to "present affirmative proof" that a defendant has been advised of his rights under N.J.S.A. 39:4-50.2(c) and (d) "in order to sustain a conviction of a per se violation under N.J.S.A. 39:4-50(a)." Rather, a defendant must move to suppress the test results in order to preserve his ability to complain about the police's failure to advise him of his rights. Ibid.
Because defendant in the present case did not allow the police to administer the Alcotest to him, the police's obligation under subsection (d) of the refusal statute to inform "the person tested" of his rights is not on point. See N.J.S.A. 39:4-50.2(d). The question then becomes whether the police fell short of their obligations under subsection (e) of the statute in the manner in which they read the standard statement to defendant.
We have held in at least one case that a trooper's failure, in dealing with an arrestee who gave an ambiguous response to the testing request, to read aloud the supplemental portion of the standard statement explaining that such an ambiguous response would be deemed a refusal, required reversal of the refusal conviction. See State v. Duffy, 348 N.J.Super. 609, 792 A.2d 555 (App.Div.2002). Duffy, which involved *1098 an incomplete reading of the standard statement, is distinguishable from the present case, in which it is undisputed that Officer Lugo read aloud the entire standard statement. Moreover, defendant's gestures and words refraining from taking the test were unambiguous. The issue here is purely one of translation.
The question of whether the standard statement must be translated into a foreign language for non-English-speaking drivers has been previously the subject of published judicial and administrative decisions. As the municipal judge here noted, the court rejected a defendant's argument to require such a translation in Nunez, supra, 139 N.J.Super. at 28, 351 A.2d 813. In that case, the defendant was charged with driving under the influence based upon the results of a breathalyzer test administered by a State Police officer. Id. at 29, 351 A.2d 813. Although the officer advised the defendant of his right to have an independent test performed in accordance with N.J.S.A. 39:4-50.2, the defendant, who did not speak English, did not understand what the officer said to him. Id. at 29-30, 351 A.2d 813.
Observing that "driving a motor vehicle on the highways of the State is a privilege, not a right" and that a driver, by virtue of the statutory licensure scheme, gives his "implied consent to submit to a breathalyzer test[,]" the Law Division judge in Nunez determined that defendant's argumentthat he was unaware that he could obtain an independent testlacked merit because the "right to have an independent test performed is a statutory right, not a constitutional one." Id. at 30-33, 351 A.2d 813. Nunez has been cited with approval in two opinions by our court, albeit not for the specific translation issue that is presented on this appeal. See State v. Mercer, 211 N.J.Super. 388, 392, 511 A.2d 1233 (App.Div.1986); State v. Casele, 198 N.J.Super. 462, 470, 487 A.2d 765 (App. Div.1985).
Likewise, in a reported administrative decision, DMV v. Iuliano, 4 N.J.A.R. 439 (1980), an administrative law judge ("ALJ") rejected a contention by a motorist who had difficulty understanding the English language that he was entitled to have the then-existing version of the standard statement translated into his native language. Citing Nunez, supra, the ALJ concluded that the public policy behind the informed consent law signified that "there can be no requirement that a licensee be read the [standard statement] in any other language except English." Id. at 444. The ALJ observed that the lack of a translation requirement should remain until such time as "the Division of Motor Vehicles promulgates a bi-lingual policy, or there is a re-examination of State v. Nunez by a[c]ourt of higher jurisdiction." Ibid.
In the present case, defendant attempts to invalidate Nunez by arguing that he is entitled to a translation of the standard statement under constitutional principles of due process of law. We are not so persuaded.
As illustrative support for his constitutional argument, defendant largely relies upon Rivera v. Board of Review, 127 N.J. 578, 606 A.2d 1087 (1992). In that case, the appellant, a migrant farm worker, was awarded unemployment benefits for the fall and winter of 1988, periods of time when he was not working in New Jersey. Id. at 580, 606 A.2d 1087. Subsequently, the Department of Labor ruled that he was ineligible for benefits, and it demanded repayment by sending the appellant a "Demand for Repayment," a "Schedule of Overpayments," and an "Important Information [N]otice" at his address in Puerto Rico. Ibid. As the Court noted, "[t]he import of the notices was that absent a timely appeal, [appellant] would be obligated to *1099 return all funds he had received since November 1988." Id. at 581, 606 A.2d 1087. Notably, all three notices were written in English. Ibid.
When the notice arrived in Puerto Rico, Rivera's daughter telephoned him in Pennsylvania, where he was looking for work, and at his request immediately forwarded the papers to him. Ibid. He received the forwarded notice on June 12, 1989, and two days later, on June 14, 1989, after having the notice translated into Spanish, he filed an appeal. Ibid.
An administrative hearing on the appeal was held before the Department's appeal tribunal on January 30, 1990. The appeal tribunal declined to hear the appeal on the merits because it had not been filed in a timely manner as required by N.J.S.A. 43:21-16(d). Ibid. Thereafter, the Board of Review affirmed the decision and that decision was subsequently upheld by this court. Id. at 582, 606 A.2d 1087.
Our Supreme Court recognized in Rivera that "[t]he Constitution demands that a person not be deprived of property or liberty absent due process of law." Id. at 583, 606 A.2d 1087 (citing Cunningham v. Dep't of Civil Serv., 69 N.J. 13, 19, 350 A.2d 58 (1975)). It also acknowledged that due process becomes adequate where the State provides "notice and an opportunity for hearing appropriate to the nature of the case." Ibid. (quoting Mullane, supra, 339 U.S. at 313, 70 S.Ct. at 656, 94 L.Ed. at 873). The Court cautioned that "[t]he touchstone of adequate process is not [an] abstract principle but the needs of the particular situation." Ibid. (citing Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972) (holding that "due process ... calls for such procedural protection as the particular situation demands")).
Treating our state statutes providing for the payment of unemployment compensation benefits akin to a form of common-law property protected by the Fifth Amendment, the Court remanded the matter, citing Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976) (setting forth a three-part balancing test weighing individual and governmental interests and the costs of different types of procedure). The Court held that the Department should have addressed the merits of appellant's claim, and, moreover, urged the Department to promulgate regulations that guaranteed adequate notice for migrant workers. Rivera, supra, 127 N.J. at 589, 606 A.2d 1087.
However, the right to due process does not automatically carry with it a right to have government documents translated into one's native language. For example, in Alfonso v. Board of Review, 89 N.J. 41, 444 A.2d 1075 (1981), a case that preceded but was not overruled by Rivera, our Supreme Court rejected the argument of a Spanish-speaking woman that the Department of Labor was obligated to translate the notices rejecting her claim for unemployment benefits into Spanish. According to the Court majority, "[t]he paramount question" under the constitution was "whether the notice given to the claimant here was calculated `under all the circumstances' to convey the required information." Id. at 44, 444 A.2d 1075. Answering this question in the affirmative in favor of the Division, the Court held that "in an English-speaking country, requirements of `reasonable notice' are satisfied when the notice is given in English." Id. at 45, 444 A.2d 1075.
In the present context of this case involving the refusal statute, we are persuaded that due process was satisfied, and that Officer Lugo was not constitutionally obligated to read the standard statement to defendant in Spanish. We are mindful that it is undisputed that defendant is not fluent in English. However, we are also *1100 mindful of the clear implications of the implied consent law, a statute that our courts have consistently upheld as constitutional. Cummings, supra, 184 N.J. at 89, 875 A.2d 906; Breslin, supra, 392 N.J.Super. at 584, 921 A.2d 1163. In procuring his New Jersey driver's license and in operating his automobile on our public roadways, defendant provided his advance consent to submit to a breath sample. That consent, as a constitutional matter, sufficiently reflects that defendant knew, or should have known, that he could not decline to blow air into the breath testing device without exposing himself to licensure sanctions.
The sufficiency of notice is buttressed by the fact that the New Jersey motor vehicle license testing process includes specific coverage of our drunk driving laws, including the refusal statute. Defendant was permitted to take the written portion of the examination in Spanish. It is noteworthy that the MVC's driver's manual, which is made available to persons such as defendant before they sit for the examination, is translated into Spanish.[5] The manual contains a specific section that describes the refusal statute and the informed consent law, as follows:
New Jersey has an implied consent law. This means that motorists on New Jersey roadways have agreed, simply by using New Jersey roadways, to submit to a breath test given by law enforcement or hospital staff following an arrest for a drinking and driving offense. Motorists who refuse to take a breath test will be detained and brought to a hospital, where hospital staff may draw blood. Motorists who refuse to take a breath test in New Jersey are subject to an MVC insurance surcharge of $1,000 per year for three years. Failure to pay this surcharge will result in an indefinite suspension of driving privileges until the fee is paid. Motorists who refuse to take a breath test will be detained and brought to a hospital, where hospital staff may draw blood.
Under state law, refusal to take a breath test is equal to driving with a BAC of .10 percent for a first offense. The current penalty for refusal is the loss of driving privileges for between seven months and one year, to run concurrently or consecutively, based upon a judge's order.[6]
Notably, all three of these informational paragraphs are translated into Spanish on the version appearing on the MVC's website.[7] Although the informational paragraphs do not detail all of the features of the refusal law, they mitigate the contention that defendant was not alerted to the refusal law because of his asserted language barrier.
We are also mindful, as was the court in Nunez, of the considerable administrative burdens that would be placed on the MVC and police departments if they were obligated in every case to translate the standard statement into a multiplicity of languages and dialects. The judiciary undertakes major endeavors to accommodate such translation requests in court proceedings.[8] Likewise, we are mindful that *1101 Miranda[9] warnings are commonly translated into Spanish. See, e.g., State v. Mejia, 141 N.J. 475, 502-03, 662 A.2d 308 (1995); State v. Cabrera, 387 N.J.Super. 81, 903 A.2d 427 (App.Div.2006); State v. Soto, 340 N.J.Super. 47, 57, 773 A.2d 739 (App.Div.2001); State in Interest of J.F., 286 N.J.Super. 89, 100, 668 A.2d 426 (App.Div.1995). But the scientifically time-sensitive nature of blood and breath evidence may not make rapid translation administratively feasible, as the evidence may dissipate or change while awaiting such a translation. See Widmaier, supra, 157 N.J. at 498, 724 A.2d 241 (observing that delaying the administration of a breath test may adversely affect the results).
To be sure, there may be good policy reasons for the MVC to now consider, as an administrative matter, having the standard statement translated into Spanish[10] and perhaps into other foreign languages prevalent in our State. The MVC might also consider creating standardized audio readings of the translated versions to be played or replayed for, DWI arrestees needing such translation. However, that policy decision, as with other prospective modifications of the standard statement, remains the prerogative of the MVC. See Spell, supra, 196 N.J. at 537, 959 A.2d 1209; see also Mejia, supra, 141 N.J. at 503, 662 A.2d 308 (sustaining defendant's conviction but recommending that the Attorney General administratively develop "appropriate bilingual Miranda warnings" for "the larger segments of the non-English speaking population"). We therefore refer this opinion to the MVC for such future regulatory consideration.
Affirmed.

APPENDIX
New Jersey tiene una ley de consentimiento implícito. Eso significa que el automovilista que conduce en los caminos de New Jersey ha acordado, por el solo hecho de utilizar los caminos de New Jersey, someterse al análisis del aliento a cargo de un oficial de la policía o un empleado de un hospital después de haber sido arrestado por conducir en estado de ebriedad. El automovilista que se niegue a someterse a un análisis del aliento será detenido y llevado a un hospital, donde el personal podrá tomar una muestra de sangre.
En New Jersey, el automovilista que se niegue a que le hagan la prueba de aliento queda sujeto a un recargo de la MVC sobre su seguro anual de $1,000 por tres años. El incumplimiento de pago de dicho recargo resultará en la suspensión indefinida del privilegio de conducir mientras no se pague el recargo. El automovilista que se niegue a someterse a un análisis del aliento será detenido y llevado a un hospital, donde el personal podrá tomar una muestra de sangre.
Las leyes estatales disponen que negarse a que le hagan una prueba de aliento equivale a conducir con un BAC del 0.10 por ciento si se trata de la primera ofensa. La sanción actual por negarse es la pérdida del privilegio de conducir por un periodo de siete meses a un año, que será aplicada concomitante o consecutivamente, según falle el juez.[11]
NOTES
[1] The extent of Officer Lugo's fluency in Spanish is not disclosed in the record.
[2] See State v. Chun, 194 N.J. 54, 75-84, 943 A.2d 114 (2008) (describing in detail the operation of the Alcotest breath device).
[3] The videotape was played, without objection, at defendant's trial. Although we have not been supplied with a copy of the videotape on appeal, the parties do not appear to dispute what it depicts.
[4] As the result of governmental reorganization, the regulatory agency is now known as the Motor Vehicle Commission. See State v. Spell, 196 N.J. 537, 540, 959 A.2d 1209 (2008).
[5] See State of New Jersey Motor Vehicle Commission, http://www.state.nj.us/mvc/About/ manuals.htm (last visited June 8, 2009). We take judicial notice of these and other relevant materials published on the Internet by the MVC. See N.J.R.E. 201.
[6] Available at: http://ww w.state.nj.us/mvc/pdf/Licenses/Driver&Manual/Chapter_7.pdf.
[7] The English to Spanish translation contained in the MVC's manual is reproduced as an Appendix to this opinion.
[8] In fact, in the court year 2007-2008, there were 87,766 interpreting events in eighty-one languages. See Njcourtsonline.com, http:// www.judiciary.state.nj.us/interpreters/ statistics.htm (last visited June 8, 2009).
[9] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[10] In 2007, for example, 15.9% of New Jersey's population was identified as Hispanic. See U.S. Census Bureau, State and County Quick Facts, http://q uickfacts.census.gov/qfd/ states/34000.html (last visited June 8, 2009).
[11] See http://www.sta te.nj.us/mvc/pdf/Manuals/Chapter7_esp.pdf.