998 A.2d 421

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. GERMAN MARQUEZ, DEFENDANT–APPELLANT.

Argued February 2, 2010—Decided July 12, 2010.

LaVecchia, J., dissented in part, concurred in part, and filed opinion in which Rivera-Soto and Hoens, JJ., joined.

488

*Michael B. Blacker,* argued the cause for appellant.

*Paul H. Heinzel,* Deputy Attorney General, argued the cause for respondent (*Paula T. Dow,* Attorney General of New Jersey, attorney).

*Edward L. Barocas* and *Michael A. Norwick,* submitted a brief *amicus curiae* on behalf of American Civil Liberties Union of New Jersey.

*Jeffrey S. Mandel,* submitted a brief *amicus curiae* on behalf of Association of Criminal Defense Lawyers of New Jersey (*PinilisHalpern,* attorneys).

Chief Justice RABNER delivered the opinion of the Court.

On September 20, 2007, the police arrested defendant German Marquez for drunk driving. Defendant spoke no English, and the police had no reason to believe that he did. Yet in a good faith, but surreal, effort to inform defendant of the consequences of refusing to submit to a breath test, a police officer read aloud a detailed, eleven-paragraph, standard statement—all in English. When defendant confirmed in Spanish that he did not understand,

the bizarre encounter continued as the officer read yet another two paragraphs in English to defendant.

The police later candidly acknowledged that defendant did not understand what was read to him. Defendant was nonetheless convicted of refusing to submit to a breath test both in municipal court and on de novo review at the trial court, and his conviction was affirmed by the Appellate Division.

We now address the interplay between the two relevant statutes involved in this appeal: (1) the implied consent law, *N.J.S.A.* 39:4–50.2, which (a) provides that by taking to the State's roadways, drivers impliedly consent to submit to a breath test to measure the level of alcohol in their blood, and (b) further requires that they be informed of the consequences of refusing to submit to such a test; and (2) the refusal statute, *N.J.S.A.* 39:4–50.4a, which provides penalties for arrested motorists who refuse to submit to that test. Because we find that the statutes require proof that law enforcement officials *inform* motorists of the consequences of refusal by conveying information in a language the person speaks or understands, we reverse defendant's conviction.

We defer to the Attorney General and the chief administrator of the Motor Vehicle Commission (MVC) to determine how law enforcement can best comply with the requirements of the statutes. In that regard, we acknowledge and encourage the initiative begun by the Attorney General to translate the standard statement into foreign languages and post written and audio translations on a website for use by law enforcement.

## I.

The facts are not in dispute. At approximately 10:00 p.m. on September 20, 2007, Officer Shane Lugo of the Plainfield Police Department responded to the scene of a motor vehicle accident. On arrival, the officer saw two vehicles that had collided and were both facing the same direction. Defendant was sitting in the driver's seat of the rear car with the engine running. The

damaged front end of his car was touching the other car's rear bumper.

The officer approached defendant and asked for his credentials in English. According to the officer, defendant did not understand him, so he repeated the request in Spanish. Defendant produced his license, registration, and insurance card in response.

As they spoke, the officer smelled alcohol coming from defendant and noticed that he slurred his speech. The officer asked defendant to get out of the car and walk to the curb. Defendant stumbled out of his vehicle and braced himself against it as he made his way to the side of the road; once he let go of the car and began to walk, he swayed back and forth.

The officer, speaking in English, tried to get defendant to perform some field sobriety tests. According to the officer, defendant appeared to listen as he leaned against a tree for support, but he did not understand. Based on the odor of alcohol on defendant's breath, his slurred speech, and swaying, the officer believed that defendant was under the influence of alcohol and placed him under arrest.

The officer next transported defendant to the police station. When they arrived, Officer Anthony Berlinski, a certified Alcotest operator, observed defendant for twenty minutes in the booking area. Both officers then brought defendant to "the Alcotest room," where a breathalyzer test could be administered using an Alcotest 7110 machine to measure defendant's blood-alcohol concentration. (A thorough description of how the Alcotest machine works can be found in State v. Chun, 194 N.J. 54, 75–84, 943 A.2d 114 (2008).) A video recorder captured the events in the room.

At this point, Officer Lugo read defendant the contents of a document titled "Division of Motor Vehicles Standard Statement for Operators of a Motor Vehicle—N.J.S.A. 39:4–50.2(e)" (standard statement). Specifically, the officer read aloud the following in English:

1. You have been arrested for operating a motor vehicle while under the influence of intoxicating liquor or drugs or with a blood alcohol concentration of 0.10% or more.

2. You are required by law to submit to the taking of samples of your breath for the purpose of making chemical tests to determine the content of alcohol in your blood.

3. A record of the taking of samples, including the date, time, and results, will be made. Upon your request, a copy of that record will be made available to you.

4. Any warnings previously given to you concerning your right to remain silent and your right to consult with an attorney do not apply to the taking of breath samples and do not give you the right to refuse to give, or delay giving, samples of your breath for the purpose of making chemical tests to determine the content of alcohol in your blood. You have no legal right to have an attorney, physician, or anyone else present for the purpose of taking breath samples.

5. After you have provided samples of your breath for chemical testing, you have the right to have a person or physician of your own selection, and at your own expense, take independent samples and conduct independent chemical tests of your breath, urine, or blood.

6. If you refuse to provide samples of your breath you will be issued a separate summons for this refusal.

7. Any response that is ambiguous or conditional, in any respect, to your consent to taking of breath samples will be treated as a refusal to submit to breath testing.

8. According to *N.J.S.A.* 39:4–50.4a, if a court of law finds you guilty of refusing to submit to chemical tests of your breath, then your license to operate a motor vehicle will be revoked by the court for a period of no less than six months and no more than 20 years. The Court will also fine you a sum of no less than $250.00 [sic] and no more than $1,000.00 for your refusal conviction.

9. Any license suspension or revocation for a refusal conviction will be independent of any license suspension or revocation imposed for any related offense.

10. If you are convicted of refusing to submit to chemical tests of your breath, you will be referred by the Court to an Intoxication Driver Resource Center and you will be required to satisfy the requirements of that center in the same manner as if you had been convicted of a violation of *N.J.S.A.* 39:4–50, or you will be subject to penalties for failure to do so.

11. I repeat, you are required by law to submit to taking of samples of your breath for the purpose of making chemical tests to determine the content of alcohol in your blood. Now, will you submit the samples of your breath?

The form provides space for an answer after that last paragraph. When the officer finished reading paragraph eleven, defendant shook his head and pointed to his eye. The officer recorded defendant's answer on the document as "shook head."

Because defendant's response was considered ambiguous, the officer read aloud the following additional paragraphs in English:

██ I have previously informed you that the warnings given to you concerning your right to remain silent and your right to consult with an attorney do not apply to the taking of breath samples and do not give you a right to refuse to give, or to delay giving samples of your breath for the purpose of making chemical tests to determine the content of alcohol in your blood. Your prior response, or lack of response, is unacceptable. If you do not unconditionally agree to provide breath samples now, then you will be issued a separate summons charging you with refusing to submit to the taking of samples of your breath for the purpose of making chemical tests to determine the content of alcohol in your blood.

██ Once again, I ask you, will you submit to giving samples of your breath?

Defendant responded, "No Entiendo"—Spanish for "I do not understand." The officer noted defendant's answer on the form as follows: "I speak Spanish 'No Entiendo.'" Officer Lugo later testified that he did not believe defendant understood what was read to him and had no reason to believe defendant spoke English.

In addition to reading the standard statement, both officers gestured to defendant to demonstrate how to use the Alcotest machine. On three or four occasions, the officers pointed to the machine and cupped their hands in an effort to show defendant what he needed to do. Defendant did not follow the officers' pantomimed efforts. Defendant was issued summonses for driving while intoxicated (DWI), *N.J.S.A.* 39:4–50, refusal to submit to a breath test, *N.J.S.A.* 39:4–50.4a, and careless driving, *N.J.S.A.* 39:4–97.

At a trial in Plainfield Municipal Court on December 18, 2007, the court heard testimony from Officers Lugo and Berlinski and viewed the videotape of events in the Alcotest room. Defendant also testified through a Spanish interpreter. It is undisputed that he does not speak English. Defendant claimed that he was not under the influence of alcohol on the night of his arrest; instead, he said that he took two Percocet tablets about fifteen to twenty minutes before driving to treat pain associated with an eye injury that he sustained five months before his arrest. Defendant testified that Percocet makes him feel sleepy and dizzy. He also stated that he did not understand what was read to him at the

police station and that he had taken his driver license exam in Spanish.

On January 29, 2008, the municipal court judge announced his findings. Based solely on Officer Lugo's observations of defendant, the court found him guilty of DWI. The court also found him guilty of refusing to submit to a breath test. The municipal court judge noted that Officer Lugo properly read the standard statement, that there was no precedent requiring that the statement be read in Spanish, and that defendant refused to take the test.

Prior to sentencing, the court merged the careless driving offense into the DWI violation. The court then suspended defendant's license for the minimum period of seven months on the refusal violation, and for three months, to run concurrently, on the DWI conviction. The court also imposed various fines and monetary assessments. The court stayed its sentence for twenty days to allow defendant to seek further review.

Defendant sought a trial de novo in the Superior Court. He focused his challenge on the refusal violation and conceded at oral argument that there was credible evidence as to the DWI offense. After conducting its review on June 6, 2008, the trial court convicted defendant. The court found that although defendant did not understand the standard statement read to him, there was no basis to require that it be read in Spanish. It was sufficient, the court concluded, to read the statement in English. The court imposed the same sentence and stayed it pending appeal.

Defendant filed an appeal limited only to the refusal conviction. *State v. Marquez*, 408 *N.J.Super.* 273, 279, 974 *A.*2d 1092 (App. Div.2009). His DWI conviction, therefore, remains intact and will not be affected by the outcome of this case. Defendant once again argued that he could not be guilty of refusal because he does not understand English. *Ibid.* The Appellate Division affirmed the conviction. *Id.* at 275, 974 *A.*2d 1092. The panel explained that "the law does not require a translation of the standard statement under *N.J.S.A.* 39:4–50.2(e)" and that "defendant gave his implied

consent to submit to a breath test when he obtained his New Jersey driver's license." *Ibid.* In addition, the Appellate Division found that due process was satisfied but recommended that the MVC prospectively consider "having the standard statement translated into Spanish and perhaps other prevalent foreign languages." *Id.* at 286, 288, 974 *A.*2d 1092.

We granted defendant's petition for certification. 200 *N.J.* 476, 983 *A.*2d 201 (2009).

## II.

Defendant argues that he was not "informed" of the consequences of refusing to submit a breath sample, pursuant to *N.J.S.A.* 39:4–50.2(e), because the standard statement was read to him in English. He also submits that hearing the standard statement read aloud in a language he did not understand is the functional equivalent of not hearing it at all. Defendant contends that the Appellate Division's ruling renders section 50.2(e) meaningless. In addition, he maintains that due process entitles him to a translation of the standard statement.

The Union County Prosecutor argues that defendant has no right to refuse to take a breath test in light of the implied consent statute. As a result, he maintains that there is no constitutional dimension to section 50.2(e) and that defendant's due process rights were not violated when he was informed of the consequences of refusal in English. Because consent is implied, the State argues, it does not matter whether defendant spoke English and could understand the standard statement; the statute only requires that the statement be read. The State also maintains that the police showed defendant how to use the Alcotest machine, but defendant refused to comply.

Prior to oral argument, the Attorney General entered this appeal and filed a supplemental brief on behalf of the State. The Attorney General contends that to sustain a refusal conviction, there is no requirement that police obtain an interpreter to read the standard statement in languages other than English. The

Attorney General also maintains that there is no statutory requirement or constitutional right to have the implied consent warnings translated into other languages. In the event a defendant claims that he is not guilty of refusal because of a genuine inability to understand English, the Attorney General submits that a court may consider the defendant's language barrier as an affirmative defense, for which the defendant should bear the burden of persuasion.

We granted amicus curiae status to the Association of Criminal Defense Lawyers of New Jersey (ACDL) and the American Civil Liberties Union of New Jersey (ACLU). The ACDL argues that, at a minimum, the standard statement should be read in any language that the MVC offers the driver license exam. In addition, the ACDL urges that officers should be required to make a good faith, reasonable effort to communicate the standard statement in a manner that motorists can understand.

The ACLU argues that the Appellate Division's decision frustrates the intent of the Legislature to "inform" motorists of the consequences of refusal. The ACLU also asserts that the State's failure to translate the standard statement into Spanish was fundamentally unfair and violated due process.

After oral argument, the Attorney General advised the Court of a new policy initiative to post written and audio versions of the standard statement in nine foreign languages on a website law enforcement officials can access. The MVC offers the written driver test in the same languages.

## III.

The statutory scheme at the heart of this case has evolved over many decades. Throughout that time, the Legislature's primary purpose has been "to curb the senseless havoc and destruction caused by intoxicated drivers." *State v. Tischio,* 107 *N.J.* 504, 512, 527 *A.*2d 388 (1987). To that end, the Legislature first criminalized drunk driving in 1921, *L.* 1921, *c.* 208, § 14, *N.J.S.A.* 39:4–50, and in 1951 put in place a presumption that anyone operating a

vehicle with a blood-alcohol level of .15% was intoxicated, *N.J.S.A.* 39:4–50.1.[1] *L.* 1951, *c.* 23, § 30.

Enforcement was undermined, though, because drivers did not have to submit to blood-alcohol tests and faced no penalties if they refused to do so. *State v. Wright,* 107 *N.J.* 488, 498, 527 *A.*2d 379 (1987). Refusal rates nationally were as high as 92%. *Ibid.* (citation omitted). In New Jersey, the State Police reported that the refusal rate in 1964–65 was 26.5%. *Ibid.* (citation omitted).

As a result, in 1966, the Legislature enacted both an implied consent law, *N.J.S.A.* 39:4–50.2, and a refusal statute, *N.J.S.A.* 39:4–50.4. *L.* 1966, *c.* 142, §§ 2, 4; *see State v. Macuk,* 57 *N.J.* 1, 11–13, 268 *A.*2d 1 (1970). The former deemed that all motorists operating a vehicle on a public road had consented to the taking of breath samples, which would be tested for blood-alcohol content, *L.* 1966, *c.* 142, § 2; the latter authorized a six-month license revocation if a driver refused to participate in the breath test. *Id.* § 4. The simultaneous passage of those laws was designed to encourage people arrested for drunk driving to submit a breath sample and to enable law enforcement to obtain objective scientific evidence of intoxication. *See Bean v. Strelecki,* 101 *N.J.Super.* 310, 313, 244 *A.*2d 316 (App.Div.1968); *see also Macuk, supra,* 57 *N.J.* at 13, 268 *A.*2d 1; *State v. Conners,* 125 *N.J.Super.* 500, 510, 311 *A.*2d 764 (Cty.Ct.1973); N.J. Motor Vehicle Study Comm'n, *Report* 136 (1975).

The initial version of the statutes did not direct officers to inform motorists of the consequences of refusal. That require-ment was added in 1977 as part of a series of amendments to the law. *L.* 1977, *c.* 29, § 3. The modifications stemmed from a 1975 report issued by the New Jersey Motor Vehicle Study Commis-sion. *See Wright, supra,* 107 *N.J.* at 500–01, 527 *A.*2d 379. That study found no evidence that drivers had "been deterred from

---

[1] The Legislature has since lowered the presumptive blood-alcohol level two times: to .10% in 1977, *L.* 1977, *c.* 29, § 2, and to .08% in 2003, *L.* 2003, *c.* 314, § 2. The presumption now appears at *N.J.S.A.* 39:4–50(a).

excessive drinking before driving" and estimated that at least 25% of those arrested for drunk driving refused the test. N.J. Motor Vehicle Study Comm'n, *supra*, at 136, 147. Indeed, it was advantageous for an offender to refuse the test because the six-month penalty for refusal was "so much shorter than any penalty imposed [for drunk driving] except for a first 'impaired' offense." *Id.* at 150–51. A second offender, for example, faced "either a two or ten year revocation, depending on his record" if charged with driving while under the influence. *Id.* at 147. Yet "[b]y refusing the test, he deprive[d] the state of objective evidence of intoxication" and risked only a six-month suspension. *Id.* at 147–48. In short, the refusal statute's penalties were insufficient to deter drunk driving or cause motorists arrested for that offense to submit breath samples.

In response, the Legislature adopted certain recommendations made by the Study Commission. In 1977, the Legislature changed the penalty to ninety days' license revocation for a first offense and added a one-year revocation for a second refusal. *See L.* 1977, *c.* 29, § 4. Because of the more stringent penalty, the Legislature added a requirement that police officers "inform the person arrested of the consequences of refus[al]." *See L.* 1977, *c.* 29, § 3; *see also* S. 1423 (Sponsor's Statement), 197th Leg. (N.J. Feb. 24, 1977) (noting that S. 1423 implements recommendation of Motor Vehicle Study Commission Report); N.J. Motor Vehicle Study Comm'n, *supra*, at 151. The Legislature also amended the implied consent law to require that the Director of the Division of Motor Vehicles (DMV) prepare a standard statement to be read to motorists. *L.* 1977, *c.* 29, § 3. (DMV is now known as the Motor Vehicle Commission.)

In 1981, the Legislature revised both statutes again. *See L.* 1981, *c.* 512, *c.* 537. Among other changes, it transferred jurisdiction for refusal cases from the Office of Administrative Law and the DMV to the municipal courts, *see L.* 1981, *c.* 512, § 2; Assem. 2293 (Sponsor's Statement), 199th Leg. (N.J. Dec. 8, 1980), and it raised the penalties for refusal to six months' license suspension

for a first offense and two years for subsequent offenses, *see L.* 1981, *c.* 537, § 2.[2] In addition, at the request of the Governor, the Legislature adopted the preponderance of the evidence standard of proof for refusal cases. *L.* 1981, *c.* 512, § 2; Letter from Governor Brendan Byrne to the Assembly re: Assembly Bill No. 2293(SR) (Jan. 4, 1982).

In *State v. Cummings,* 184 *N.J.* 84, 95, 875 *A.*2d 906 (2005), this Court held that because refusal cases are quasi-criminal in nature and subject to double jeopardy principles under *State v. Widmaier,* 157 *N.J.* 475, 500, 724 *A.*2d 241 (1999), the proper burden of proof is beyond a reasonable doubt.

## IV.

### A.

To evaluate defendant's claim, we look to the Legislature's intent expressed through the implied consent and refusal statutes. Legislative intent "is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005).

We therefore begin with the terms of the statutes. We read the words chosen by the Legislature "within their context" and give them "their generally accepted meaning." *N.J.S.A.* 1:1-1. To accomplish that, we read the statutes in their entirety and construe "each part or section . . . in connection with every other part or section to provide a harmonious whole." *Bedford v. Riello,* 195 *N.J.* 210, 224, 948 *A.*2d 1272 (2008) (citations omitted).

---

[2] The Legislature later increased the period of license suspension for refusal on two occasions. In 1994, it added a ten-year suspension for a third or subsequent offense. *L.* 1994, *c.* 184, § 2. In 2004, it raised the penalty for a first offense to suspension for not less than seven months or more than one year. *L.* 2004, *c.* 8, § 2. The current statute also contains corresponding fines ranging from $300 to $1000. *N.J.S.A.* 39:4-50.4a(a).

■ If the plain language of a statute is ambiguous or open to more than one plausible meaning, we may consider extrinsic evidence including legislative history and committee reports. *Burnett v. County of Bergen*, 198 *N.J.* 408, 421, 968 *A.*2d 1151 (2009) (citations omitted); *DiProspero, supra*, 183 *N.J.* at 492–93, 874 *A.*2d 1039 (citations omitted).

### B.

As required, we start with the language of the statutes. The implied consent law today reads as follows:

(a) Any person who operates a motor vehicle on any public road, street or highway or quasi-public area in this State *shall be deemed to have given his consent to the taking of samples of his breath* for the purpose of making chemical tests to determine the content of alcohol in his blood; provided, however, that the taking of samples is made in accordance with the provisions of this act and at the request of a police officer who has reasonable grounds to believe that such person has been operating a motor vehicle in violation of the provisions of R.S.39:4–50 or section 1 of P.L. 1992, c. 189 (C.39:4–50.14).

(b) A record of the taking of any such sample, disclosing the date and time thereof, as well as the result of any chemical test, shall be made and a copy thereof, upon his request, shall be furnished or made available to the person so tested.

(c) In addition to the samples taken and tests made at the direction of a police officer hereunder, the person tested shall be permitted to have such samples taken and chemical tests of his breath, urine or blood made by a person or physician of his own selection.

(d) The police officer shall inform the person tested of his rights under subsections (b) and (c) of this section.

(e) No chemical test, as provided in this section, or specimen necessary thereto, may be made or taken forcibly and against physical resistance thereto by the defendant. *The police officer shall, however, inform the person arrested of the consequences of refusing to submit to such test in accordance with section 2 [(N.J.S.A.39:4–50.4a)] of this amendatory and supplementary act. A standard statement, prepared by the chief administrator, shall be read by the police officer to the person under arrest.*

[*N.J.S.A.* 39:4–50.2 (emphasis added).]

The refusal statute provides in part,

(a) ... the municipal court shall revoke the right to operate a motor vehicle of any operator who, after being arrested for a violation of R.S.39:4–50 or section 1 of P.L. 1992, c. 189 (C.39:4–50.14), shall refuse to submit to a test provided for in section 2 of P.L. 1966, c. 142 (C.39:4–50.2) when requested to do so, for not less than seven months or more than one year unless the refusal was in connection with

a second offense under this section, in which case the revocation shall be for two years or unless the refusal was in connection with a third or subsequent offense under this section in which case the revocation shall be for ten years....

*The municipal court shall determine* by a preponderance of the evidence[3] whether the arresting officer had probable cause to believe that the person had been driving or was in actual physical control of a motor vehicle on the public highways or quasi-public areas of this State while the person was under the influence of intoxicating liquor or a narcotic, hallucinogenic, or habit-producing drug or marijuana; whether the person was placed under arrest, if appropriate, and *whether he refused to submit to the test upon request of the officer;* and if these elements of the violation are not established, no conviction shall issue.

[*N.J.S.A.* 39:4–50.4a (emphasis added).]

To identify all of the elements of a refusal offense, we must look at the plain language of both statutes because although they appear in different sections, they are plainly interrelated. Focusing on what police officers must say to motorists helps demonstrate that point. In essence, the refusal statute requires officers to *request* motor vehicle operators to submit to a breath test; the implied consent statute tells officers *how* to make that request. In the language of the statutes, to be convicted for refusal, judges must find that the driver "refused to submit to the test *upon request of the officer.*" *N.J.S.A.* 39:4–50.4a(a) (emphasis added). That test, as explicitly noted in the refusal statute, is the one "provided for in section 2 of P.L. 1966, c. 142 (C.39:4–50.2)"—the implied consent law. The implied consent statute, in turn, directs officers to read a standard statement to the person under arrest for the specific purpose of *informing* "the person arrested of the consequences of refusing to submit to such test in accordance with section 2 [(*N.J.S.A.* 39:4–50.4a)]."[4]

---

[3] As discussed previously, the standard of proof to sustain a conviction is beyond a reasonable doubt. *Cummings, supra,* 184 *N.J.* at 95, 875 *A.2d* 906.

[4] The dissent suggests that the statute would mean something different if its drafters had written "the person arrested shall be informed by the police officer" instead of "the police officer shall inform the person arrested." We see no difference in the meaning of the two phrases. In the context of the implied consent statute, no legislative history or canon of statutory construction supports the novel view of passive voice that the dissent has put forward.

Thus, the statutes not only cross-reference one another internally, but they also rely on each other substantively. They must therefore be read together. Otherwise, police looking at section 50.4a in isolation could seemingly choose any words they might prefer to "request" that a driver submit to a breath test. Yet the Legislature in section 50.2(e) pointedly tells officers (a) that they "shall . . . read" a statement prepared by the MVC chief administrator to motorists, and (b) why they must do so. To find that the two statutes are independent of one another in this context would in effect read section 50.2(e) out of existence. That approach would violate accepted norms of statutory construction because "courts are to avoid constructions that make statutory provisions . . . meaningless." *Paper Mill Playhouse v. Millburn Twp.*, 95 *N.J.* 503, 521, 472 *A.*2d 517 (1984); *see also G.S. v. Dep't of Human Servs.*, 157 *N.J.* 161, 172, 723 *A.*2d 612 (1999); *Peper v. Princeton Univ. Bd. of Trs.*, 77 *N.J.* 55, 68, 389 *A.*2d 465 (1978).

█ To the extent *Wright* suggests a different approach, it does so in a very different context that does not apply here. *Wright* addressed "whether a defendant may be convicted under *N.J.S.A.* 39:4–50.4a for refusing to submit to a breathalyzer test without proof that he actually was operating a motor vehicle at the time of his arrest." *Wright, supra,* 107 *N.J.* at 490, 527 *A.*2d 379. In analyzing that question, the Court looked to differences in language in the above two statutes about *operating* a vehicle and noted the following distinction: section 50.2 deems that "[a]ny person who operates a motor vehicle" has given consent, whereas section 50.4a applies to situations when an "arresting officer had probable cause to believe that the person had been driving." *See id.* at 502, 527 *A.*2d 379. The former statute, the Court explained, addresses actual drivers; the latter covers people "who may or may not have been driving but . . . [are] reasonably suspected of having been driving." *Id.* at 494–95, 502–03, 527 *A.*2d 379 (internal quotation marks and citations omitted) (quoting with approval dissenting opinion in Appellate Division). In that context, the Court concluded that "each statute is self-contained." *Id.* at 494,

527 *A.*2d 379. By contrast, to identify how police are to ask motorists to submit to a breath test, the two statutes must be read in tandem.

■ A careful reading of the two statutes reveals four essential elements to sustain a refusal conviction: (1) the arresting officer had probable cause to believe that defendant had been driving or was in actual physical control of a motor vehicle while under the influence of alcohol or drugs; (2) defendant was arrested for driving while intoxicated; (3) the officer requested defendant to submit to a chemical breath test and informed defendant of the consequences of refusing to do so; and (4) defendant thereafter refused to submit to the test. *N.J.S.A.* 39:4–50.2(e), 39:4–50.4a(a); *Wright, supra,* 107 *N.J.* at 490, 527 *A.*2d 379.

*Wright* listed all but the third element.[5] It did not consider the specific statutory requirement in section 50.4a that an officer *request* a motorist submit to a chemical test, an issue that was not in dispute in the case. Although the issue is squarely presented today, the dissent repeatedly chooses to strip that plain language in the refusal statute of meaning. *Wright* focused instead on whether a motorist could be convicted of refusal without proof of having actually operated a vehicle. It therefore mentioned only in passing that the officer "advised [defendant] of his rights, and asked him to submit to a breathalyzer test," *Wright, supra,* 107 *N.J.* at 491, 527 *A.*2d 379, and did not address the issue in reciting the elements of refusal.

Cases decided after *Wright* have spoken more about the requirement that officers inform motorists of the consequences of refusal. In *Widmaier,* for example, the Court grappled with a

[5] *Wright* stated that "[t]o secure a conviction under *N.J.S.A.* 39:4–50.4a, the State must prove only that (1) the arresting officer had probable cause to believe that defendant had been operating a vehicle while under the influence of alcohol; (2) defendant was arrested for driving while intoxicated; and (3) defendant refused to submit to a breathalyzer test." *Wright, supra,* 107 *N.J.* at 490, 527 *A.*2d 379.

defendant's conditional response to the standard statement.[6] *Widmaier, supra,* 157 *N.J.* at 480, 483–86, 724 *A.*2d 241. The defendant agreed to take the test but wanted his attorney present. *Id.* at 484–85, 724 *A.*2d 241.

In its review of the statutory landscape, the Court explained that

[t]he Legislature has required that a standard statement be read to any defendant subjected to the test. *N.J.S.A.* 39:4–50.2(e). By doing so, *the Legislature has provided a procedural safeguard to help ensure that defendants understand the mandatory nature of the breathalyzer test,* their limited rights to counsel for purposes of the test, and the need for unequivocal, affirmative consent.

[*Id.* at 489, 724 *A.*2d 241 (emphasis added).]

The Court went on to find that defendant had failed to consent and that "anything substantially short of an unconditional, unequivocal assent to an officer's request that the arrested motorist take the breathalyzer test constitutes a refusal to do so." *Id.* at 497, 724 *A.*2d 241 (quoting *State v. Bernhardt,* 245 *N.J.Super.* 210, 219, 584 *A.*2d 854 (App.Div.1991)). The Court then urged the MVC "to consider revising the standard statement to further ensure that suspects understand that an ambiguous or conditional answer to a request to submit to a breathalyzer test will be deemed a refusal." *Id.* at 498–99, 724 *A.*2d 241.

*Wright* and *Widmaier* left unaddressed whether the reading of the standard statement is a necessary element of a refusal conviction. The Appellate Division, in *State v. Duffy,* 348 *N.J.Super.* 609, 612–13, 792 *A.*2d 555 (App.Div.2002), concluded that the statement must be read to obtain a conviction. In *Duffy,* an opinion authored by then-Judge Wallace, a defendant offered equivocal responses to the standard statement. He said that he would take the test but was sick, that he thought he could take it, and that he would take the test under duress. *Id.* at 610–11, 792 *A.*2d 555. The officer interpreted defendant's responses as a

---

[6] The Court also found that appeals from an acquittal of a refusal charge in municipal court are barred by double jeopardy principles. *Id.* at 501, 724 *A.*2d 241.

refusal and did not read the required additional statement. *Id.* at 612, 792 *A.*2d 555. For that reason, the Appellate Division reversed the refusal conviction. It found that "the failure to inform defendant that his response was considered a refusal, and that unless he replied yes he would be cited for a refusal, [was] a fatal defect in the State's case." *Id.* at 612–13, 792 *A.*2d 555.

The Court returned to the refusal statute in *Cummings*, when it found that proof beyond a reasonable doubt is the proper standard for refusal cases. *Cummings, supra,* 184 *N.J.* at 89, 875 *A.*2d 906. That ruling, the Court explained, "should have no discernable adverse effect" on prosecutions that required the following: "Police officers still must provide defendants the standardized statement of the consequences for the failure to submit to a breathalyzer test required under *N.J.S.A.* 39:4–50.2(e)" and meet the other three requirements recited above. *Id.* at 96, 875 *A.*2d 906. "Save for the burden of proof, nothing has changed." *Ibid.*; *see also State v. Kim,* 412 *N.J.Super.* 260, 267, 989 *A.*2d 864 (App.Div. 2010).

We also note that the Attorney General's written guidelines for the prosecution of refusal violations list similar elements to the four-part standard outlined above: "(1) a person; (2)[w]as operating a motor vehicle on a public highway, or vessel; (3)[t]he person was arrested, on probable cause, for a DWI violation; [and] (4)[t]he person refused to submit to chemical breath testing, *after the law enforcement official read the Standard New Jersey Motor Vehicle Commission ... Statement for that offense to that person.*" Office of the Att'y Gen., *Attorney General's Guideline: Prosecution of DWI & Refusal Violations* 4–5 (Jan. 24, 2005) (emphasis added), *available at* http://www.state.nj.us/oag/dcj/agguide/d-10jd-dwi-2005.pdf.[7]

---

[7] To undermine the guideline, the dissent references a letter from the director of the Division of Criminal Justice that *pre*-dates the guideline and discusses a different issue. *Post* at 518–19 n. 3, 998 *A.*2d at 441 n. 3. In any event, the letter, which forbids translation of the standard statement, has plainly been

■  Accordingly, consistent with the plain language of the statutes and the case law, we find that refusal convictions require proof that an officer requested a motorist to submit to a chemical breath test and informed the person of the consequences of refusing to do so.[8]  The fact that motorists are deemed to have implied their consent, pursuant to section 50.2(a), does not alter that conclusion. Sections 50.2(e) and 50.4a nonetheless impose an obligation on officers to inform drivers of the consequences of refusal.

C.

We turn our attention now to the third element of a refusal violation—the obligation that police "request" motorists to submit to a test and "inform" them of the consequences of refusal.

For ease of reference, we repeat the relevant language of the implied consent statute: "The police officer shall ... inform the person arrested of the consequences of refusing to submit to such test in accordance with [*N.J.S.A.* 39:4-50.4a].  A standard statement, prepared by the chief administrator, shall be read by the police officer to the person under arrest."  *N.J.S.A.* 39:4-50.2(e).

To determine what that means in the context of a driver who does not speak or understand English, we again begin with the

---

superseded by the Attorney General's own, completed efforts to translate the statement into nine common languages. *See infra* at 512, 998 *A.*2d at 437.

[8] The dissent does not agree that reading the standard statement is an element of a refusal offense.  Instead, it looks to other states and imports a reasonable efforts test to gauge whether police officers have informed defendants of the consequences of refusal. *Post* at 523–24, 998 *A.*2d at 444–45.  Our responsibility in identifying the elements of a statute, though, is to interpret the precise language the New Jersey Legislature used in crafting this State's laws, in light of the legislative history.  The Legislature did not direct that officers take objectively reasonable steps to inform defendants; rather, it specifically mandated that officers read a particular statement, *N.J.S.A.* 39:4-50.2(e), and it made conviction dependent on whether a defendant refused to submit to a test "upon request of the officer," *N.J.S.A.* 39:4-50.4a(a).  It is not for the courts to rewrite those statutes and substitute a different approach.

plain language of the statute. "To inform" means "to communicate knowledge to" and "make acquainted." *Webster's Third New International Dictionary* 1160 (3d ed. 1993). "Inform implies the imparting of knowledge, especially of facts or events necessary to the understanding of a pertinent matter." *Ibid.*

■  By its own terms, therefore, the statute's obligation to "inform" calls for more than a rote recitation of English words to a non-English speaker. Knowledge cannot be imparted in that way. Such a practice would permit Kafkaesque encounters in which police read aloud a blizzard of words that everyone realizes is incapable of being understood because of a language barrier. That approach would also justify reading aloud the standard statement to a hearing-impaired driver who cannot read lips. We do not believe that the Legislature intended those absurd results. Rather, its directive that officers "inform," in the context of the implied consent and refusal statutes, means that they must convey information in a language the person speaks or understands.

To the extent there is any ambiguity in the statute, the legislative history and interpretive case law provide additional guidance. The relevant language in section 50.2(e) was added to the statute in 1977. *L.* 1977, *c.* 29, § 3. As recounted earlier, the Legislature implemented a number of recommendations made by the Motor Vehicle Study Commission in its September 1975 Report. S. 1423 (Sponsor's Statement), 197th Leg. (N.J. Apr. 26, 1976). Specifically, the Commission recommended more stringent penalties for a second refusal. N.J. Motor Vehicle Comm'n, *supra,* at 153. For that very reason, the Commission also recommended that "police should be required to warn the driver of the possible consequence of refusing to submit to a chemical test." *Id.* at 151. In other words, notwithstanding that drivers are deemed to consent to a breath test by law, the Commission wanted to offset potential, harsher consequences by conveying knowledge of them to drivers at the scene.

This Court's decision in *Widmaier* is once again instructive. In that case, the Court not only described the standard statement as

"a procedural safeguard to help ensure that defendants understand the mandatory nature of the breathalyzer test," but also encouraged the MVC to revise the statement "to further ensure that suspects understand that an ambiguous or conditional answer to a request to submit to a breathalyzer test will be deemed a refusal." *Widmaier, supra,* 157 *N.J.* at 489, 498–99, 724 *A.*2d 241.

Although *Widmaier's* pronouncement arose in a different context, its import is clear: motorists must be reminded that a breath test is mandatory, and the Legislature's chosen safeguard was meant to help ensure that defendants understood that fact—even though they had already impliedly consented to the test. To read the statement in a language a driver does not speak is inconsistent with that end.

This Court in *State v. Badessa,* 185 *N.J.* 303, 314, 885 *A.*2d 430 (2005), identified a related goal of the statute: the "principal purpose" of having an officer advise a driver of the penalties for refusal "is to impel the driver to take the test so that the State will have the evidence necessary to prosecute a DWI charge." That aim, likewise, is not met by reading words in a language the driver does not understand.

In essence, reading the standard statement to motorists in a language they do not speak is akin to not reading the statement at all. The latter scenario renders a conviction defective. *See Duffy, supra,* 348 *N.J.Super.* at 612–13, 792 *A.*2d 555. It makes no sense that English speakers will be acquitted if incomplete warnings are read to them in English, *see ibid.,* yet foreign-language speakers can be punished on the basis of empty warnings that fail to inform them. Such an approach is not faithful to the text of section 50.2(e).

The parties have called attention to a Law Division decision in 1976, *State v. Nunez,* 139 *N.J.Super.* 28, 351 *A.*2d 813 (Law Div.1976), which is not persuasive. In *Nunez,* a defendant unsuccessfully moved to suppress the results of a breath test because he did not understand his right, under *N.J.S.A.* 39:4–50.2(c), to have an independent test performed.

Subsection (e), at issue here, did not exist when *Nunez* was decided. The legislative objectives that animate subsection (e) thus played no role in the decision. *Nunez* is therefore distinguishable. That said, section 50.2(d) required that officers "shall inform" motorists of the right to an independent test. The State trooper read a statement in English to that effect but reported that the defendant did not speak or understand English; the defendant, a native Spanish speaker, contended he did not understand. *Id.* at 31–32, 351 *A*.2d 813.

In two sentences, the trial court explained that "[i]nform" means "to give information to impart knowledge" and declared that the trooper "did give the information to Nunez." *Id.* at 33–34, 351 *A*.2d 813. However, the trial court did not explain how reading a statement in a language the listener did not speak could impart knowledge in any meaningful way. *Nunez* was not appealed and has not been adopted by this Court. Its evaluation of subsections (c) and (d) is not convincing authority in this matter.[9]

Relying on the plain language of section 50.2(e), the Legislature's reasons for adding that section, and prior case law on point, we find that to "inform," within the meaning of the implied consent and refusal statutes, is to convey information in a language the person speaks or understands.

### D.

What, then, is the practical impact of the requirement that police officers "inform" motorists of the consequences of refusal?

---

[9] The dicta in *Division of Motor Vehicles v. Iuliano*, 4 *N.J.A.R.* 439 (Adm.Div. of Motor Vehicles 1980), similarly lacks force. In that case, the Administrative Law Judge's belief that the standard statement need only be read in English was premised on *Nunez*. *Id.* at 443–44. Also, earlier in the opinion, the ALJ found that despite a "minor language barrier," Iuliano was "able to comprehend English to a degree which would enable him to understand the" standard statement. *Id.* at 442–43.

Obviously, reading the standard statement in English to motorists who speak English will suffice. If people cannot hear or do not speak or understand English, however, some other effort must be made to "inform" them "of the consequences of refusing to submit." *N.J.S.A.* 39:4–50.2(e). Providing a written document to hearing-impaired individuals in a language they understand will ordinarily suffice. Addressing non-English speakers, though, is more complicated.

Many different languages are spoken in our State. According to statistics for the court year 2007–08, 87,766 court events required translation services in 81 languages. N.J. Judiciary, Admin. Office of the Courts, Language Servs. Section, *Number of Interpreted Events Detailed by County and 15 Most Interpreted Languages Fiscal Year 2008 (July 2007–June 2008)* ["*Interpreted Events FY 2008*"], *available at* http://www.judiciary.state.nj.us/interpreters/fy2007_2008.pdf. However, the vast majority of cases involved a limited number of languages. Spanish translations, for example, accounted for 74,762, or about 85%, of the translated sessions.[10] *Ibid.*

The MVC acknowledges the challenge of serving the diverse language needs of New Jersey motorists. It includes the implied consent law in a driver's manual that is available in Spanish. State of N.J. Motor Vehicle Comm'n, New Jersey Driver *Manual* 117 (Dec. 2007), *available at* http://www.state.nj.us/mvc/pdf/Licenses/Driver%20Manual/Chapter_7.pdf; State of N.J. Motor Vehicle Comm'n, *El Manual del Conductor De New Jersey* 117 (Dec. 2007), *available at* http://www.state.nj.us/mvc/pdf/Manuals/

---

[10] The next most frequently translated languages in our courts were Portuguese (2,127 events), Polish (1,404), Korean (1,255), Haitian Creole (1,157), American Sign Language (1,118), Chinese/Mandarin (942), Russian (804), Arabic (706), and Vietnamese (425). *See Interpreted Events FY 2008, supra.* Most of the 81 languages required translation only infrequently: 61 languages were translated in fewer than 100 sessions each. Of those, 34 languages were translated in ten or fewer sessions each. *Ibid.* Thus, it appears that in more than 90% of cases, language barriers can be broken down with translation of a select, relatively small group of languages.

drivermanual_esp.pdf. It offers the driver license written exam in English, Arabic, Chinese, French, Spanish, Korean, Polish, Portuguese, Russian, and Japanese; oral tests are conducted in English and Spanish. State of N.J. Motor Vehicle Comm'n, *Knowledge Test*, http://www.state.nj.us/mvc/Licenses/KnowledgeTest.htm (last visited June 30, 2010). (Those nine foreign languages comprised 93% of translated court events in the court year 2007–08. *See Interpreted Events FY 2008, supra.*) In addition, if the tests are not offered in the applicants' native language, the MVC allows them to use an interpreter. *See Knowledge Test*, supra.

Another complicating factor is the need to collect breath samples quickly. The body begins to eliminate alcohol "as soon as a person begins to drink." *Chun, supra,* 194 *N.J.* at 76, 943 *A.*2d 114. "[B]ecause breath sample evidence 'is evanescent and may disappear in a few hours,' police must administer the breathalyzer test within a reasonable time after the arrest in order to obtain an accurate reading." *Widmaier, supra,* 157 *N.J.* at 487, 724 *A.*2d 241 (quoting *State v. Dyal,* 97 *N.J.* 229, 239, 478 *A.*2d 390 (1984), and citing *State v. Leavitt,* 107 *N.J.* 534, 541, 527 *A.*2d 403 (1987)).

The executive branch, and not the courts, is best-equipped to respond to those concerns and still satisfy the statutory command to "inform ... motorists of the consequences of refus[al]." *N.J.S.A.* 39:4–50.2(e). We defer to the executive branch agency, specifically, to the chief administrator of the MVC, to fashion a proper remedy with the assistance of the Attorney General. The Legislature authorized the MVC to develop the standard statement, *see N.J.S.A.* 39:4–50.2(e), and we have consistently deferred to the MVC regarding it. *See State v. Spell,* 196 *N.J.* 537, 539–40, 959 *A.*2d 1209 (2008) (referring procedure outlined by Appellate Division for consideration by MVC); *Widmaier, supra,* 157 *N.J.* at 498–99, 724 *A.*2d 241 (recommending that DMV supplement standard statement to address conditional response by motorist); *Leavitt, supra,* 107 *N.J.* at 541–42, 527 *A.*2d 403 (recommending that DMV revise standard statement "to advise the suspect that his right to consult with an attorney before giving any oral or

written statement does not give him the right to refuse to give (or to delay giving) the breath sample when requested").

Faced with a similar problem, which had constitutional over-tones, we encouraged the Attorney General to develop "appropri-ate bilingual *Miranda* warnings" to communicate those rights to non-English speaking defendants. *State v. Mejia*, 141 *N.J.* 475, 503, 662 *A.*2d 308 (1995). In doing so, we recognized "that law-enforcement officials cannot print *Miranda* warnings for all lin-guistic minorities. But that should not prevent the State from preparing cards for the larger segments of the non-English speak-ing population." *Ibid.* We recognize the same practical con-straints today, in light of the statistics recounted earlier, and make a similar recommendation. In order to meet the requirements of the statute, we encourage the MVC and the Attorney General to develop methods to translate and communicate the standard state-ment to motorists who do not speak English.

We understand that the Attorney General has already taken substantial steps in that regard. After oral argument in this case, the Attorney General advised the Court that (1) it has arranged for certified translated versions of the standard statement to be prepared—in both written and audio form—in the nine foreign languages in which the MVC offers the written driver's test, namely, Arabic, Chinese (Mandarin), French, Japanese, Korean, Polish, Portuguese, Russian, and Spanish; (2) it has posted trans-lated written and audio files on its website, http://www. njpdresources.org; and (3) it was sending an advisory to all police departments to notify them of those developments.

The Attorney General's initiative, if properly utilized, will enable law enforcement to inform nearly all drivers in New Jersey of the consequences of refusal. Motorists who took the driver exam in one of the nine foreign languages would be covered. We defer to the MVC to determine what to do about the small percentage of additional motorists who would not be covered.

▆▆▆ We recognize that complications may arise even with the use of translated written documents and audio files. For example, drivers may ask police officers follow-up questions that will go unanswered. For those encounters, officers should communicate the additional statement that is given any time a motorist provides an ambiguous or conditional response. *See Widmaier, supra,* 157 *N.J.* at 498, 724 *A.2d* 241; Standard Statement, ¶¶ 12–13, *ante* at 7.

However, given the need to collect samples quickly and the large number of potential languages involved, it is not practical to expect that interpreters will be available on short notice in all cases. Precious time would be wasted in locating and transporting police officers or interpreters able to "read" the standard statement in a particular language, *see N.J.S.A.* 39:4–50.2(e), and we do not construe the statute so narrowly as to require that approach. As noted in *Wright,* "[w]e have consistently given a broad interpretation to the drunk driving laws when a narrow interpretation would frustrate th[e] legislative policy" of curbing drunk driving. *Wright, supra,* 107 *N.J.* at 497, 527 *A.2d* 379 (citing *Tischio, supra,* 107 *N.J.* 504, 527 *A.2d* 388 and *State v. Mulcahy,* 107 *N.J.* 467, 527 *A.2d* 368 (1987)).

## V.

▆▆▆ We add the following. It is no defense to a refusal charge for drivers to claim that they were too drunk to understand the standard statement. *See State v. Quaid,* 172 *N.J.Super.* 533, 537, 412 *A.2d* 1087 (Law Div.1980). In other words, it is not necessary for the State to prove that a driver actually understood the warnings on a subjective level. *Cf. Widmaier, supra,* 157 *N.J.* at 498, 724 *A.2d* 241 ("[D]efendant's subjective intent is irrelevant in determining whether the defendant's responses to the officer constitute a refusal to take the test."). If properly informed in a language they speak or understand while sober, drivers can be convicted under the implied consent and refusal statutes. Voluntary, excessive drinking cannot and does not void the statutes.

Indeed, that type of voluntary behavior is fundamentally distinct from a person's utter lack of ability to understand a foreign language.

To that end, warnings given in English will presumably be competent. Police, though, may choose to ask if a suspect speaks English.

■ Whether there is sufficient evidence to sustain a conviction will depend on the facts of a particular case. Once again, the State is required to prove the four elements of refusal beyond a reasonable doubt. Thus, if a person established that she spoke only Italian, and was not informed of the consequences of refusal in that language, she could not be convicted under the refusal statute. Nonetheless, she could be convicted of the independent offense of DWI based on the observations of the officer and any other relevant evidence—as occurred in this case.

■ Defendants who claim that they do not speak or understand English must bear the burden of production and persuasion on that issue. *See Leavitt, supra,* 107 *N.J.* at 542, 527 *A.*2d 403 (explaining that defendant should bear burden of persuasion to establish claim of confusion without resolving whether claim may be asserted); *State v. Sherwin,* 236 *N.J.Super.* 510, 518, 566 *A.*2d 536 (App.Div.1989) (noting defendant failed to offer affirmative evidence of confusion, "much less carr[y] his burden of persuasion on the issue"). That information is peculiarly within the possession of the defendant, not the State. *Cf. Kim, supra,* 412 *N.J.Super.* at 269, 989 *A.*2d 864. In addition, this approach will help separate feigned claims from real ones.

VI.

■ In this case, it is undisputed that defendant does not speak English. As a result, Officer Lugo's reading of the standard statement to him in English failed to "inform" defendant of the consequences of refusal, as required. We therefore reverse defendant's refusal conviction.

In light of that outcome, we do not reach defendant's constitutional due process claim. *See Hennessey v. Coastal Eagle Point Oil Co.*, 129 *N.J.* 81, 109, 609 *A.2d* 11 (1992) (Pollock, J., concurring) ("[C]onstitutional questions should not be reached and resolved unless absolutely imperative in the disposition of the litigation." (quoting *State v. Saunders*, 75 *N.J.* 200, 229, 381 *A.2d* 333 (1977) (Clifford, J., dissenting))); *see also Burnett, supra*, 198 *N.J.* at 420, 968 *A.2d* 1151 (same); *Bell v. Stafford Twp.*, 110 *N.J.* 384, 389, 541 *A.2d* 692 (1988) (same).

## VII.

For the reasons set forth above, we reverse defendant's refusal conviction and vacate that portion of his sentence. The stay of defendant's DWI sentence is lifted and will commence at once.

Justice LaVECCHIA dissenting in part and concurring in judgment.

Respectfully, I must dissent in part from the Court's holding in this matter. My disagreement goes to the core conclusion reached by my colleagues in the majority. I simply do not agree that the procedural safeguards imposed by the implied consent law, *N.J.S.A.* 39:4–50.2, are an additional substantive element of the offense of refusing to submit to a chemical breath test that the prosecutor must prove beyond a reasonable doubt in order to sustain a refusal conviction under *N.J.S.A.* 39:4–50.4a. The majority mistakenly transforms the procedural safeguards of the implied consent law into a substantive right under the refusal statute, and makes the fact that motorists on New Jersey's roadways have given their implied consent to chemical breath tests entirely meaningless. In my view the two statutes can be harmonized and effect given to both, which is the goal we should strive to achieve. The Legislature intended that the procedural requirements of the implied consent law would be followed by police officers. In determining whether that procedural requirement has been satisfied, I would focus on whether the police

officers made reasonable efforts under the attendant circumstances to inform the defendant of the consequences of refusing to submit to a chemical breath test, in accord with the statutory language of the implied consent law. The novel interpretation announced today by the majority eviscerates the implied consent statute, a result that is at odds with the salutary policies intended by having an implied consent condition imposed on all licensed drivers.

## I.

The Legislature's primary motivation in enacting drunk driving laws in New Jersey was "to remove intoxicated drivers from our roadways and thereby 'to curb the senseless havoc and destruction' caused by them." *State v. Chun,* 194 *N.J.* 54, 71, 943 *A.*2d 114 (2008) (quoting *State v. Tischio,* 107 *N.J.* 504, 512, 527 *A.*2d 388 (1987)). That senseless havoc and destruction saw more than 11,000 people lose their lives across the United States in 2008 as a result of intoxicated drivers.[1] *See* Nat'l Highway Traffic Safety Admin., *Traffic Safety Facts 2008 Data: Alcohol–Impaired Driving* 1 (2008), *available at* http://www-nrd.nhtsa.dot.gov/Pubs/811155.PDF. This Court consistently has interpreted New Jersey drunk driving laws "both broadly and pragmatically to ensure that the Legislature's intent is effectuated." *Chun, supra,* 194 *N.J.* at 71, 943 *A.*2d 114 (citations omitted).

The issue raised in this case requires a focus on the relationship between the two statutes commonly referred to as the refusal statute, *N.J.S.A.* 39:4–50.4a, and the implied consent law, *N.J.S.A.* 39:4–50.2. Because the analysis in this case requires the interpretation of legislation, we must be mindful not only of the manner in

---

[1] The term "intoxicated drivers" refers to those drivers with a blood alcohol content (BAC) above the legal limit of 0.08, a BAC that has been adopted by every state, the District of Columbia, and Puerto Rico as per se evidence of intoxication. *See* Nat'l Highway Traffic Safety Admin., *Traffic Safety Facts 2008 Data: Alcohol–Impaired Driving* 1 (2008), *available at* http://www-nrd.nhtsa.dot.gov/Pubs/811155.PDF.

which this Court traditionally has construed drunk driving laws, but also of established principles of statutory construction, namely that

> [w]hen construing a statute, our primary goal is to discern the meaning and intent of the Legislature. *See State v. Smith,* 197 *N.J.* 325, 332, 963 *A.*2d 281 (2009) (citation omitted). In most instances, the best indicator of that intent is the plain language chosen by the Legislature. *See DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005) (citation omitted).
>
> [*State v. Gandhi,* 201 *N.J.* 161, 176–77, 989 *A.*2d 256 (2010).]

In a case such as this one, where the Court is tasked with delineating the precise interplay between two statutes, "we attempt to construe statutes on the same subject as part of a harmonious whole." *Klumb v. Bd. of Educ.,* 199 *N.J.* 14, 32, 970 *A.*2d 354 (2009). Indeed, "when cognate laws are passed, a presumption of at least equal force is present that they were intended to become part of a consistent whole unless they or parts of them are expressly or impliedly incompatible." *Jacobs v. N.J. State Highway Auth.,* 54 *N.J.* 393, 401, 255 *A.*2d 266 (1969). Thus, so long as it is possible, we do not interpret one statute in a manner that strips another statute of its meaning. *See Paper Mill Playhouse v. Millburn Twp.,* 95 *N.J.* 503, 521, 472 *A.*2d 517 (1984) ("[C]onstruction that will render any part of a statute inoperative, superfluous or meaningless, is to be avoided." (quotation marks and citations omitted)).

The text of the refusal statute sets forth the elements required for a refusal conviction. It provides, in pertinent part, that

> [t]he municipal court shall determine ... whether the arresting officer had probable cause to believe that the person had been driving or was in actual physical control of a motor vehicle on the public highways or quasi-public areas of this State while the person was under the influence of intoxicating liquor ...; whether the person was placed under arrest, if appropriate, and whether he refused to submit to the test upon request of the officer; and if *these elements of the violation* are not established, no conviction shall issue.
>
> [*N.J.S.A.* 39:4–50.4a(a) (emphasis added).]

Our prior case law construed that statutory language as requiring that,

> [t]o secure a conviction under *N.J.S.A.* 39:4–50.4a, the State must prove *only* that (1) the arresting officer had probable cause to believe that defendant had been

operating a vehicle while under the influence of alcohol; (2) defendant was arrested for driving while intoxicated; and (3) defendant refused to submit to a breathalyzer test.

[*State v. Wright,* 107 *N.J.* 488, 490, 527 *A.2d* 379 (1987) (emphasis added); *see also State v. Badessa,* 185 *N.J.* 303, 312, 885 *A.2d* 430 (2005) (quoting *Wright, supra,* 107 *N.J.* at 490, 527 *A.2d* 379).]

Nothing in our decisions has suggested that there was an unknown fourth element to a refusal conviction lurking in the ether and that appears nowhere in the statutory language of *N.J.S.A.* 39:4–50.4a(a).[2] In fact, our decision in *State v. Cummings,* 184 *N.J.* 84, 875 *A.2d* 906 (2005), made explicit that requiring prosecutors to prove the elements of a refusal statute beyond a reasonable doubt "should have no discernable adverse effect" on such prosecutions because "[s]ave for the burden of proof, nothing has changed." *Id.* at 96, 875 *A.2d* 906. Although we referenced the fact that "[p]olice officers still must provide defendants the standardized statement of the consequences for the failure to submit to a breathalyzer test required under *N.J.S.A.* 39:4–50.2(e)," *ibid.,* we were careful to specify that that requirement was imposed by the implied consent law, *N.J.S.A.* 39:4–50.2(e), and we did not *include it as an additional substantive element that must be proven to sustain a refusal conviction under N.J.S.A.* 39:4–50.4a.[3]

---

[2] The majority, in its discussion of *Wright, supra,* 107 *N.J.* 488, 527 *A.2d* 379, and *State v. Widmaier,* 157 *N.J.* 475, 724 *A.2d* 241 (1999), devotes most of its effort to describing what those cases did not say. *See ante* at 502–04, 998 *A.2d* at 431–33. I prefer to focus on what those cases did say, and said clearly.

[3] Further, all that we required in *Cummings, supra,* was that police officers "provide defendants the standardized statement" as required by the statutory text of the implied consent law, *N.J.S.A.* 39:4–50.2(e). 184 *N.J.* at 96, 875 *A.2d* 906. Here, defendant concedes that he was read the standard statement in its entirety; his only argument is that he could not understand it. Thus, the majority's discussion of *Cummings* is mostly irrelevant. The majority's reliance on the Appellate Division's decision in *State v. Duffy,* 348 *N.J.Super.* 609, 792 *A.2d* 555 (App.Div.2002), is inapposite for the same reason.

The majority can point to only a single source, *see* Office of the Att'y Gen., *Attorney General Guideline: Prosecution of DWI & Refusal Violations* 4–5 (Jan. 24, 2005), *available at* http://www.state.nj.us/oag/dcj/agguide/d-10jd-dwi-2005.

The text of the implied consent law is equally clear in establishing its statutory requirements. It provides, in pertinent part, as follows:

> (a) Any person who operates a motor vehicle on any public road, street or highway or quasi-public area in this State shall be deemed to have given his consent to the taking of samples of his breath for the purpose of making chemical tests to determine the content of alcohol in his blood;
>
> . . . .
>
> (e) No chemical test, as provided in this section, or specimen necessary thereto, may be made or taken forcibly and against physical resistance thereto by the defendant. The police officer shall, however, inform the person arrested of the consequences of refusing to submit to such test in accordance with [*N.J.S.A.* 39:4–50.4a]. A standard statement, prepared by the director, shall be read by the police officer to the person under arrest.
>
> [*N.J.S.A.* 39:4–50.2.]

Our decisions have recognized that the purpose of the implied consent law "is to encourage motorists suspected of driving under the influence to submit to breathalyzer tests." *Widmaier, supra,* 157 *N.J.* at 487, 724 *A.2d* 241 (citing *Wright, supra,* 107 *N.J.* at 499, 527 *A.2d* 379); *see also Badessa, supra,* 185 *N.J.* at 313–14, 885 *A.2d* 430 ("The principal purpose of a police officer advising a driver about the penalties that flow from refusing to take the breathalyzer test is to impel the driver to take the test so that the

---

pdf, that actually refers to the requirements imposed by the implied consent law, *N.J.S.A.* 39:4–50.2(e), as a substantive component of a refusal conviction under *N.J.S.A.* 39:4–50.4a. Yet, in giving such great weight to a tool created by the Attorney General to assist lay and attorney law enforcement participants in presentations of DWI and Refusal prosecutions, the majority, at the very least, should acknowledge that the same office that it cites in support of its "element" finding further directs that "the content of the Standard Statement *cannot be altered or changed in any manner,* and *cannot be translated to any other language.*" Office of Att'y Gen., *Revision, Standard DWI Refusal Statement, Effective April 26, 2004* 2 (April 27, 2004) (emphasis in original), *available at* http://www.state.nj.us/oag/dcj/agguide/refusalmemo042004.pdf. That position is at odds with the conclusion that the majority draws from the Attorney General's perplexing guidelines reference. In my view, the Attorney General's inartful reference in the guidelines is in error, has no support in our prior case law, and was disavowed through the Attorney General's contrary position in this matter. Therefore, the State should not be tagged with that seeming error in the Attorney General's guidelines.

State will have the evidence necessary to prosecute a DWI charge." (citation omitted)). Plainly put, "[a] person suspected of driving while intoxicated has no right to refuse to take a breathalyzer test." *State v. Stever*, 107 *N.J.* 543, 561, 527 *A.*2d 408 (1987).

The implied consent law represents the Legislature's effort to coerce motorists to submit to a chemical breath test, which is precisely why the penalties for refusing to submit to such a test have been made more stringent over time. *See generally Wright, supra*, 107 *N.J.* at 500–02, 527 *A.*2d 379. We have described the implied consent law not as a source of substantive rights, but rather as "a procedural safeguard." *Widmaier, supra*, 157 *N.J.* at 489, 724 *A.*2d 241. It was not intended, as the majority suggests, to make defendants aware that they had a right to refuse to submit to a chemical breath test, but rather just the opposite: the implied consent law was intended "to help ensure that defendants understand the *mandatory nature* of the breathalyzer test." *Ibid.* (emphasis added). Given that understanding of the implied consent law as a prophylactic measure, its remedial purpose, and its central importance to combating drunk driving in New Jersey, I cannot dismiss its primary feature—that all motorists in New Jersey have consented to submit to chemical breath tests—as easily as does the majority.

That said, the refusal statute and the implied consent law are interrelated. And, I do not quarrel with the majority's characterization that "the refusal statute requires officers to *request* motor vehicle operators to submit to a breath test; [and] the implied consent statute tells officers *how* to make that request." *Ante* at 500–01, 998 *A.*2d at 430. However, that tidy characterization does not mean, as the majority contends, that the requirements imposed by the implied consent law must be imported and incorporated as an element of the refusal statute that the prosecutor must prove beyond a reasonable doubt in order to sustain a refusal conviction. More is required to reach such a new and novel parsing of these statutes than the mere fact that they are interrelated.

Equally important is how and why the two statutes are related, which is "to facilitate drunk driving investigations," by enabling "the enforcing authorities to reach out during the very short window in time during which the scientific evidence of intoxication is available." *Wright, supra,* 107 *N.J.* at 502, 527 *A.*2d 379 (internal quotation marks and citation omitted). The majority's interpretation undermines that purpose by reading into the refusal statute a requirement found nowhere in its text, and at the same time eviscerates the rationale behind the implied consent law that gives it its force. Respectfully, the primary flaw in the majority's reasoning is that it disregards the entire foundational basis for our implied consent law, namely that "[a]ny person who operates a motor vehicle on any public road, street or highway or quasi-public area in this State shall be deemed to have given his consent to the taking of samples of his breath for the purpose of making chemical tests to determine the content of alcohol in his blood." *N.J.S.A.* 39:4–50.2(a). Under the majority's approach, that basic purpose to the implied consent law contains no residual force: a defendant must understand the consequences of refusing to submit to a chemical breath test before he or she can be convicted of refusal. Thus, the majority mistakenly transforms the procedural safeguards of the implied consent law into a substantive right under the refusal statute, and makes the fact that motorists on New Jersey's roadways have given their implied consent to chemical breath tests entirely meaningless. That result does damage to both statutes and ignores the directive to, whenever possible, give equal force to separate statutes that are part of a common statutory scheme, *see Jacobs, supra,* 54 *N.J.* at 401, 255 *A.*2d 266, and not to interpret one statute so as to render the other inoperative, *see Paper Mill Playhouse, supra,* 95 *N.J.* at 521, 472 *A.*2d 517.

The two statutes can be read in harmony and full effect can be given to both, without one undermining the other, by simply following a first principle of statutory construction, which directs the focus on the plain text of each statute, *see DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039. Under that approach, it is clear,

as discussed previously, that the Legislature named three, and only three, elements comprising the offense for refusing to submit to a chemical breath test under *N.J.S.A.* 39:4–50.4a: (1) that there was probable cause to believe that the defendant was operating a vehicle while intoxicated; (2) that the defendant was arrested for that offense; and (3) that the defendant refused to submit to the test. *See N.J.S.A.* 39:4–50.4a; *Wright, supra,* 107 *N.J.* at 490, 527 *A.*2d 379; *Badessa, supra,* 185 *N.J.* at 312, 885 *A.*2d 430.

The implied consent law imposes the distinct procedural requirement that "[t]he police officer shall ... inform the person arrested of the consequences of refusing to submit to such test in accordance with [*N.J.S.A.* 39:4–50.4a]." *N.J.S.A.* 39:4–50.2(e). It is possible to give effect to that statutory language without finding that it is incorporated as a substantive element of a refusal conviction under *N.J.S.A.* 39:4–50.4a. The majority makes much of the dictionary definition of the word "inform," but ignores the remainder of the statutory language and the context in which that word is used. The implied consent law does not state that "*the driver must be informed of* the consequences of refusing to submit to a chemical breath test" or any like variation. Instead, the statute's view is from the perspective of the police officer—the person who is doing the informing—and not on the person who is being informed. *See N.J.S.A.* 39:4–50.2(e) ("The police officer shall ... inform the person arrested....").[4] Its terms impose a

---

[4] When engaging in statutory interpretation, we are not free to examine the Legislature's words in a vacuum, choosing which word or words to prioritize and what meaning to ascribe. Rather, "[w]e are encouraged, when construing the words of a statute, to 'read and examine the text of the act and *draw inferences concerning the meaning from its composition and structure.'*" *Smith, supra,* 197 *N.J.* at 333, 963 *A.*2d 281 (emphasis added) (quoting 2A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction* § 47:1 (7th ed. 2007)); *see N.J.S.A.* 1:1–1 (stating Legislature's intent that statutes be construed "according to the approved usage of the language"). The majority emphasizes the word "inform" and the word "defendant" to the exclusion of the balance of the sentence and to the rules of grammar that require a different conclusion. This Court has not hesitated to seek guidance from the rules of grammar and sentence structure in past decisions involving statutory construction. *See, e.g.,*

procedural requirement on police officers to "inform" a defendant and it is silent concerning any requirement that a defendant understand the information being imparted, which is entirely sensible where the defendant is, by definition, intoxicated and potentially incapable of understanding the information conveyed by the police officer due to that intoxication.[5]

In understanding what is required by *N.J.S.A.* 39:4-50.2(e), the analysis must be anchored in that statutory language. In determining whether a police officer has "inform[ed] the person arrested of the consequences of refusing to submit to [a chemical breath] test," *N.J.S.A.* 39:4-50.2(e), the legislative intent was to focus on the actions of the police officer because he or she is the actor addressed by the statutory language. Thus, one need only deter-

---

*Gandhi, supra,* 201 *N.J.* at 179, 989 A.2d 256 (quoting *The Chicago Manual of Style* on positioning of adverbs); *see also G.S. v. Dep't of Human Svcs., Div. of Youth & Fam. Svcs.,* 157 *N.J.* 161, 173-74, 723 A.2d 612 (1999) (relying on presumption "that Legislature is familiar with rules of diction and grammar" (citation omitted)).

The implied consent law—and, specifically, the verb phrase "shall inform"—is written in the future tense of the active voice. The voice of a verb "shows whether the subject acts (active voice) or is acted on (passive voice)—that is, whether the subject performs or receives the action of the verb." *The Chicago Manual of Style* § 5.112 (15th ed. 2003). The future tense, which is formed by the addition of the word "shall" before the verb, "refers to an expected act, state, or condition." *Id.* at § 5.118. These verb traits (voice and tense) are integral to reading and comprehending the meaning of a sentence. Thus, in the case of the implied consent law, it is the officer (the subject of the sentence) who acts, and the defendant (the object of the sentence) who receives the act.

The majority imputes an act to the defendant that is neither specified nor required by the statute: the act of being informed. In so doing, the majority casts what is intended to be a sentence compelling action by the officer into a sentence requiring a specific reaction by a defendant: the act of processing information, and becoming informed.

[5] It would be absurd to permit an individual to escape conviction for refusal because he or she was too intoxicated to understand the information being imparted by the police officer. Yet, although such a result should be self-evident, the majority must take pains to stress that fact because the reasoning utilized throughout its opinion leads naturally and logically to the opposite conclusion.

mine whether *the officer* made objectively reasonable efforts to inform the defendant under the circumstances. Such a standard is not only faithful to the statutory language, but also has the advantage of being sensible and workable, as evidenced by the adoption of a like construction in other states. *See State v. Garcia,* 756 *N.W.*2d 216, 223 (Iowa 2008) ("We adopt a reasonableness standard, which requires a law enforcement officer who has asked a person suspected of driving under the influence of alcohol to submit to chemical testing, under the circumstances facing the officer at the time of the arrest, to utilize those methods which are reasonable and would reasonably convey Iowa's implied consent warnings."); *State v. Piddington,* 241 *Wis.*2d 754, 623 *N.W.*2d 528, 534–35 (2001) (requiring "the arresting officer under the circumstances facing him or her at the time of the arrest, to utilize those methods which [are] reasonable, and would reasonably convey the implied consent warnings").[6]

Respectfully, the majority goes too far in requiring that police officers "must convey information in a language the person speaks or understands." *ante* at 507, 998 *A.*2d at 434. Courts across the country that have considered this issue have reached the same conclusion. *See, e.g., People v. Wegielnik,* 152 *Ill.*2d 418, 178 *Ill.Dec.* 693, 605 *N.E.*2d 487, 491 (1992) (refusing to require that warnings be given in language spoken by defendant because "[w]e find no meaningful distinction between a motorist who cannot comprehend the statutory warnings because of injury or intoxication, and one who does not understand them due to insufficient

---

[6] The majority implies that the dissent relies on these out-of-state cases to rewrite New Jersey's drunk driving statutes. *See ante* at 506 n. 8, 998 *A.*2d at 434 n. 8. The cases are simply cited to show that, in practice, the objective standard is both "sensible and workable." As discussed throughout this separate opinion, the objective standard that should be applied is directly tethered to the statutory language of the implied consent law, which provides that "[t]he police officer shall, however, inform the person arrested of the consequences of refusing to submit to [a chemical breath test]," *N.J.S.A.* 39:4–50.2(e), and is completely and understandably silent concerning any requirement that the defendant understand those consequences.

English language skills"); *Yokoyama v. Comm'r of Pub. Safety*, 356 *N.W.*2d 830, 831 (Minn.Ct.App.1984) ("Although making an interpreter available when possible is desirable, finding an interpreter is not absolutely necessary and should not interfere with the evidence-gathering purposes of the implied consent statute." (internal quotation marks and citations omitted)); *Martinovic v. Commonwealth*, 881 *A.*2d 30, 36 (Pa.Commw.Ct.2005) ("[W]hen motorists are limited by their understanding of the English language, thereby allegedly preventing them from 'knowingly' refusing the test, we still hold that those motorists 'knowingly' refused the test absent some other verifiable impediment. Otherwise, anyone who speaks little to no English can automatically claim that he or she did not understand the . . . warnings and avoid the consequences of refusing a chemical test, just as anyone who is drunk could automatically claim that he or she was too drunk to understand the . . . warnings and avoid the consequences of refusing a chemical test." (citations omitted)).

An objective test to determine whether the officer made reasonable efforts to "inform" the defendant would not require translation into multiple languages. Such a test would, however, satisfy the Legislature's desire for that procedural step in such motor vehicle stops. Naturally, translation would minimize any difficulties encountered in satisfying a reasonableness test: translation of the statement would per se satisfy the reasonableness standard that should be applied. Therefore, although I recognize the beneficial effects to be achieved from the Attorney General's efforts to translate the standard statement into other languages, I see no basis for imposing that requirement as a matter of law.

Indeed, the majority's decision breaks with our history of deferring to the Motor Vehicle Commission's (MVC) interpretation of the drunk driving statutes, particularly when the standard statement is in issue, a deference required as a matter of legislative choice. *See N.J.S.A.* 39:4–50.2(e) ("A standard statement, prepared by the director [of the MVC], shall be read by the police officer to the person under arrest."); *State v. Spell*, 196 *N.J.* 537,

539-40, 959 *A*.2d 1209 (2008) ("[T]he Legislature has vested in the Chief Administrator of the [MVC] ... the authority to determine the contents and procedure to be followed in respect of that standard statement.... [I]n keeping with the express legislative allocation of responsibilities set forth in *N.J.S.A.* 39:4–50.2(e), we refer the procedure outlined by the Appellate Division to the Chief Administrator of the [MVC] for consideration."). Although the majority speaks of deferring to the MVC, that claimed deference lacks substance in light of the thrust of its opinion that requires that the standard statement be given to a suspected drunk driver in the language that the driver speaks. Our drunk driving statutes, which were enacted to protect the public from "the senseless havoc and destruction" caused by drunk drivers, *Tischio, supra,* 107 *N.J.* at 512, 527 *A.*2d 388, do not require translation and any reading of the statutory scheme that would require translation is unfaithful to the text and the purpose underlying our statutory scheme to eliminate drunk drivers from the highways and byways of New Jersey.

## II.

Applying that standard in the review of the police officers' actions in this matter would require a focus on the actions of the officers under the circumstances to determine whether the officers made objectively reasonable efforts to inform the defendant of the consequences of refusing to submit to a chemical breath test. First, it is noteworthy that the police officers were aware that defendant did not speak English. Indeed, one of the officers spoke to defendant in Spanish. When the officers were attempting to explain the procedure for providing a breath sample and, then proceeded to read to him the standard statement, defendant indicated that he did not understand what was being asked of him or read to him.

Despite the fact that one of the officers spoke some Spanish to defendant, the officer did not make an effort to further communicate with defendant in Spanish even though he later testified that

he did not believe that defendant understood what was read to him and believed that defendant did not speak English.[7]  Instead, the officers mimicked how to use the Alcotest machine in a futile charade.  In this scenario, where one of the officers in the room was able to communicate with defendant in his native language, but did not do so, I cannot find that the police officers made an objectively reasonable effort to satisfy the legislative desire that the officer convey to defendant the consequences of refusing to submit to a chemical breath test.  That prophylactic reminder is intended to coerce compliance with giving a breath sample.  The courts ought to compel officers to engage in objectively reasonable efforts to accomplish that legislative preference for compliance.  However, I would not superimpose that procedural right as a substantive element for a refusal conviction.

A fact-sensitive analysis is necessary and, had the factual circumstances been different, I might not reach the same conclusion.  For example, had the defendant spoken another language that was unfamiliar to the attending police officers, the officers should not be required to track down an interpreter of the pertinent language, for numerous reasons, not the least of which is the evanescent nature of the evidence in drunk driving cases.  The chemical breath test must be administered shortly after an arrest in order to obtain an accurate reading because any delay may see the evidence disappear as the body processes and eliminates the alcohol.  See Widmaier, supra, 157 N.J. at 488, 724 A.2d 241 ("In adopting the unequivocal consent rule, courts have acknowledged that delays in performing breathalyzer tests would lead to inaccurate results and would eviscerate the very purpose of the DWI statutes."); see also Chun, supra, 194 N.J. at 76, 943 A.2d 114.

---

[7] It is worth noting that the police officer followed protocol as he was directed by the Attorney General's guidelines, which state that "the content of the Standard Statement cannot be altered or changed in any manner, and cannot be translated to any other language."  Office of Att'y Gen., Revision, Standard DWI Refusal Statement, Effective April 26, 2004 2 (April 27, 2004) (emphasis in original).

## III.

The majority, by requiring that police officers "must convey information in a language the person speaks or understands," *ante* at 507, 998 *A.*2d at 434, makes non-English speakers immune to prosecution for violating the refusal statute unless and until the standard statement is translated into the language spoken by each of those individuals. As the majority points out, in the 2007–08 court year alone, eighty-one different languages were spoken in our courts. *Ante* at 510, 998 *A.*2d at 436. The fact that some of those languages are uncommon cuts against, and not in favor of, the majority's holding that information must be conveyed in a language that the defendant speaks or understands because it will simply not be feasible to hire or find translators for those occurrences. Moreover, it is one thing to accommodate non-English speaking persons in scheduled test-taking situations or during orderly court proceedings, it is quite another to expect law enforcement officials on the streets or patrolling our roads to have constantly at-hand a means of access to whatever language is spoken by a person who has obtained a license to drive a motor vehicle. It is particularly incongruous that in our motor vehicle licensure test-taking, we ensure that the applicant can utilize his or her spoken language to confirm their understanding that by obtaining a motor vehicle license he or she gives implied consent to be tested for drunk driving. Yet round-the-clock translation must be available to police officers on patrol to reconfirm that understanding, again, when that person is suspected of violating the drunk driving laws.

Immunizing people from refusal convictions, unless a translator or a written translation is provided at the motor vehicle stop and breath-testing, logically makes it more difficult to prosecute them for driving while intoxicated because the most concrete and important piece of evidence—blood alcohol content—will not be available to the police or the prosecutor. *See Wright, supra,* 107 *N.J.* at 498, 527 *A.*2d 379 ("Without a breathalyzer test, police were denied a method of reliably distinguishing those motorists who

were drunk from motorists who displayed symptoms of drunkenness that were actually attributable to other causes."). In a state in which 154 persons were killed by intoxicated drivers during 2008 alone, *see Traffic Safety Facts 2008 Data: Alcohol–Impaired Driving, supra,* at 6 tbl. 4, I cannot sanction such a result. Furthermore, a decision that absolves individuals of violating the refusal statute plainly ignores the fact that by driving a motor vehicle on a public roadway in New Jersey that individual has consented to providing chemical breath tests when there is probable cause for a police officer to believe that the individual was intoxicated. *See N.J.S.A.* 39:4–50.2(a). Although there has been a decrease in the number of drivers who refuse to provide breath samples due in part to the implied consent law, as of 2005 almost one in five drivers in New Jersey arrested on suspicion of drunk driving still refused to consent to a chemical breath test. *See* Nat'l Highway Traffic Safety Admin., *Refusal of Intoxication Testing: A Report to Congress* 5 (2008), *available at* http://www.nhtsa.gov/DOT/NHTSA/Traffic%20Injury%20Control/Articles/Associated%20Files/811098.pdf.

## IV.

In light of the overall purpose behind our drunk driving statutory scheme, and the clear words of both the refusal statute and the implied consent law, I respectfully dissent from the majority's judgment to the extent that it holds that the requirements imposed on police officers by the implied consent law, *N.J.S.A.* 39:4–50.2 are a substantive element of a refusal offense under *N.J.S.A.* 39:4–50.4a that must be proven by the prosecutor beyond a reasonable doubt to sustain such a conviction. Based on an analysis of the statutory requirement that "[t]he police officer shall ... inform the person arrested of the consequences of refusing to submit to [a chemical breath] test," *N.J.S.A.* 39:4–50.2(e), I cannot agree with the majority's conclusion that the focus was meant to be on the defendant and whether he or she was subjectively "inform[ed]."

Rather, the plain language of the statute focuses on the police officer and the objectively reasonable, procedural steps he or she must take to inform a suspected drunk driver of the consequences of refusal in order to fulfill that coercive purpose intended by the procedurally required statement. I find no basis in the statute for compelling, as the majority does, that the Attorney General translate the standard statement into an unspecified number of languages other than English, in readiness for the many variations of languages spoken by persons in the populace. I therefore dissent from that part of the majority's holding. However, because in this case the police officers did not take objectively reasonable efforts to inform defendant, as I believe they procedurally were required to do, a prophylactic response is required and I would not sustain this conviction. I therefore concur in the ultimate judgment that reverses this conviction. Respectfully, however, I must disavow the majority's reasoning in support of its holding.

Justices RIVERA–SOTO and HOENS join in this opinion.

*For reversal and vacation*—Chief Justice RABNER and Justices LONG, ALBIN and WALLACE—4.

*Concurring in part; dissenting in part*—Justices LaVECCHIA, RIVERA–SOTO and HOENS—3.